Jessica **MALDONADO**, Plaintiff–Appellant,

v.

**U.S. BANK and Manufacturers Bank,** Defendants–Appellees.

No. 98–3837.

United States Court of Appeals, Seventh Circuit.

Argued April 20, 1999.

Decided July 9, 1999.

Ernest T. Rossiello (argued), Rossiello & Associates, Chicago, IL, for Plaintiff–Appellant.

Edward P. Freud (argued), Ruff, Weidenaar & Reidy, Chicago, IL, for Defendants–Appellees.

Before CUDAHY, DIANE P. WOOD and EVANS, Circuit Judges.

CUDAHY, Circuit Judge.

From what we can tell, this case goes to the core of the Pregnancy Discrimination Act (PDA), 42 U.S.C. § 2000e(k): an employer cannot discriminate against a pregnant employee simply because it believes pregnancy *might* prevent the employee from doing her job. U.S. Bank fired Jessica Maldonado the day after she announced to her supervisor, Amalia Gonzalez, that she was pregnant. Maldonado sued, alleging sex discrimination in violation of the PDA. The district court granted the defendant's motion for summary judgment. Maldonado now appeals that decision, as well as the district court's denial of her motion to strike a supplemental affidavit filed by the bank in support of its

motion. For the reasons which follow, we reverse the district court's order granting summary judgment in favor of the bank and affirm its denial of Maldonado's motion to strike.

## I.

Maldonado primarily challenges the district court's grant of summary judgment in favor of the bank. The district court noted that a PDA plaintiff can pursue either a direct case (under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)) or an indirect case (using the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) burden-shifting method). *See* Dis. Ct. Op. and Order, at 9. Maldonado, the court surmised, was attempting to make an indirect case, but had produced no evidence that similarly situated non-pregnant employees were treated differently; she therefore failed to make out a *prima facie* case. *See id.* at 9–10. The district court also held that, even if Maldonado had succeeded in shifting the burden to the bank, the bank had articulated a non-discriminatory reason for terminating Maldonado (namely, her inability to meet the job requirement that she be able to substitute for full-time tellers) and that Maldonado had not shown this reason to be pretextual. *See id.* at 10–12. Maldonado now argues that the district court improperly assumed that she was pursuing an indirect case against the bank when in fact she was advancing a direct case. She claims that she has direct evidence—in the form of an admission—that the bank fired her because she was pregnant.

■ After examining Maldonado's filings below (particularly her brief in opposition to the bank's motion for summary judgment), we cannot fault the district court for approaching this case using an indirect evidence framework; Maldonado's

mixing-and-matching of legal elements and framing of the evidentiary issues appears to be an attempt to shift the burden to the bank in classic *McDonnell Douglas* fashion. But some of the evidence and some of her language also suggest that she thought she was making out a direct case. In any event, it is clear that confusion reigned, and so we take this opportunity to restate this Circuit's position on pregnancy discrimination.[1]

■ Title VII makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex…." 42 U.S.C. § 2000e–2(a). Congress amended Title VII in 1978 to explicitly extend protection to pregnant women: "[w]omen affected by pregnancy, childbirth or related medical conditions shall be treated the same for all employment-related purposes … as other persons not so affected but similar in their ability or inability to work…." 42 U.S.C. § 2000e(k). It designed the PDA specifically to address the stereotype that "women are less desirable employees because they are liable to become pregnant," *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044–45 (7th Cir.1999), and to insure that the decision whether to work while pregnant "was reserved for each individual woman to make for herself." *International Union, United Auto. Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 206, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991); *see also* 29 C.F.R. §§ 1604.10(b) and 1604 App. (Intro.). Nonetheless, under the PDA, employers are not required to give pregnant women special treatment; they must only treat them the same as all other employees. *See, e.g., Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 722

---

1. Cases discussing pregnancy discrimination are obviously the most directly pertinent. But all Title VII claims charging discrimination on an impermissible ground, whatever

the ground, are instructive. *See, e.g., Venters v. City of Delphi*, 123 F.3d 956, 972 (7th Cir.1997).

(7th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 167, 142 L.Ed.2d 136 (1998); *Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 738 (7th Cir.1994) ("Employers can treat pregnant women as badly as they treat similarly affected but nonpregnant employees, even to the point of conditioning the availability of an employment benefit on an employee's decision to return to work after the end of the medical disability that pregnancy causes.") (internal quotation and citation omitted); *see also* 29 C.F.R. § 1604 App. (Questions and Answers, No. 5).

■ To prevail on a pregnancy discrimination claim, a plaintiff "must show that she was treated differently because of her pregnancy." *Geier v. Medtronic, Inc.,* 99 F.3d 238, 241 (7th Cir.1996); *see also Marshall v. American Hosp. Ass'n,* 157 F.3d 520, 525 (7th Cir.1998) (on summary judgment, the court "must determine whether [the employee] presented a question of fact as to whether [the employer] treated her less favorably because of her pregnancy.") Put another way, "[a]n unlawful employment practice occurs whenever pregnancy is a motivating factor for an adverse employment decision." *Hunt–Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago,* 104 F.3d 1004, 1010 (7th Cir.1997). Such a practice can be shown in two ways.

■ First, a PDA plaintiff "may present enough evidence to demonstrate that her discharge was a result of intentional discrimination." *Kennedy,* 140 F.3d at 722. Evidence of intentional discrimination can be either direct—"evidence that can be interpreted as an acknowledgment of discriminatory intent by the defendant," *Troupe,* 20 F.3d at 736; *see also Indurante v. Local 705, Int'l Bhd. of Teamsters, AFL–CIO,* 160 F.3d 364, 366 (7th Cir.1998) (direct proof is "the sort of evidence of discrimination that in itself entitles [a plaintiff] to take [her] case to a jury without disproving [the defendant's] stated rationale for firing [her]")—or circumstantial—for example, ambiguous statements or suspicious timing, *see Troupe,* 20 F.3d

at 736. A plaintiff may use a combination of direct and circumstantial evidence to make her case. "Once a plaintiff shows that an employment decision was motivated in part by her pregnancy, the defendant may avoid a finding of liability by proving that it would have made the same decision had the plaintiff not been pregnant." *Geier,* 99 F.3d at 241 (citing *Price Waterhouse,* 490 U.S. at 245, 109 S.Ct. 1775). If, for example, the employer based the employment action on a bona fide occupational qualification (BFOQ), it will not be liable under Title VII. *See* 42 U.S.C. § 2000e–2(e)(1); *Johnson Controls,* 499 U.S. at 201, 111 S.Ct. 1196; *Price Waterhouse,* 490 U.S. at 244–45, 109 S.Ct. 1775. This method of proof is generally called a direct case.

■ Alternatively, a plaintiff can use the ubiquitous *McDonnell Douglas* approach to frame her case. If she establishes a *prima facie* case of discrimination, the employer can then offer a legitimate, non-discriminatory reason for the plaintiff's treatment, which shifts the burden back to the plaintiff to show that the proffered explanation is pretextual. *See, e.g., Geier,* 99 F.3d at 241–42. This method of proof is generally called an indirect case.

■ A PDA plaintiff, such as Maldonado, can pursue either a direct case or an indirect case, or can try both methods at once. *See, e.g., Kennedy,* 140 F.3d at 723. "If a plaintiff merely emphasizes one method of proof, but the proper result is clear under the other method, we need not rely on procedural niceties and ignore the obvious." *Indurante,* 160 F.3d at 366–67. In any case, the bottom line is the same: a plaintiff must show a discriminatory motive either with some evidence that is incriminating in itself or by ruling out other plausible motives for the adverse employment action. "Simply put, the question is whether the plaintiff has established a logical reason to believe that the decision to terminate her rests on a legally forbidden

ground." *Venters*, 123 F.3d at 972 (internal quotations and citations omitted).

The bank claims that "[t]his Court will search the record in vein [*sic*] for any" such evidence. Appellee's Br. at 31. Because we are reviewing a summary judgment, we must accept the bank's invitation. We review the record *de novo*, viewing the evidence in the light most favorable to Maldonado and using the same standards as the district court. *See, e.g., Marshall*, 157 F.3d at 524. Summary judgment is appropriate only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED.R.CIV.P. 56(c). "We apply the summary judgment standard with particular care in employment discrimination cases, which often turn on issues of intent and credibility." *Kennedy*, 140 F.3d at 722.

The broader factual framework is not in dispute. Sometime in late January or early February 1997, Maldonado filled out a job application at the bank. Gonzalez later contacted Maldonado and arranged to interview her for a part-time teller position. On February 10, Gonzalez interviewed Maldonado and told her that part-time tellers had the same duties as full-time tellers (helping customers, counting money, etc.) and were required to be available six days a week to substitute for absent full-time tellers. Maldonado understood that Gonzalez had a particular need for part-timers during the peak summer vacation months. Three days later, Maldonado learned that she was pregnant and that the baby was due in July.[2] Maldonado began her two-to-three weeks of teller training at the bank on February 20. As part of that training, she received an employee manual, which made it clear that she was a "provisional" employee for her first three months and that she must have at least one year of service to be eligible for pregnancy leave. On either Thursday, February 27, or Friday, February 28, Maldonado told at least one of her colleagues that she was pregnant. The following Monday, March 3, while still in training, Maldonado informed Gonzalez that she was pregnant. Gonzalez fired Maldonado the next day. The parties' differing accounts of the two conversations between Maldonado and Gonzalez—the one in which Maldonado announced her pregnancy on March 3 and the other in which Gonzalez dismissed her on March 4—are critically important, and so we examine them in more detail.

We start at the beginning—with the complaint. Maldonado attached as an exhibit to the complaint a copy of the discrimination charge she filed with the E.E.O.C. on March 18, 1997. Although not evidence competent to combat summary judgment, this charge sums up her allegations in four neat paragraphs:

I. I was employed as a teller at U.S. Bank from on or about February 20, 1997 until on or about March 4, 1997, when I was discharged because of my pregnant condition. I always performed my job duties to the legitimate expectations of my employer.

II. On or about March 3, 1997 at approximately 9:15 a.m., I informed Amalia Gonzalez, vice president, of the fact that I was pregnant.

III. On or about March 4, 1997 at around 4:00 P.M., Ms. Gonzalez

---

**2.** In her Local Rule 12(N) counter-statement of facts, Maldonado denied that she *learned* that she was pregnant on February 13, 1997. She claimed that "She was *told* on February 13, 1997 that she was most likely pregnant, but she was also advised that her pregnancy would have to be confirmed by a doctor" (emphasis added) and that she did not actually see a doctor until after February 20. *See* Maldonado Dep. at 92–93, 99. Earlier in the deposition, however, Maldonado unequivocal-ly affirmed that she became aware of her pregnancy for the first time on February 13. *See id.* at 30–31. The later testimony, in response to questions from her attorney, only clarifies what the nurses at the clinic told her; it does not materially alter Maldonado's earlier testimony. After the February 13 clinic visit, it appears that Maldonado *believed* that she was pregnant; when her belief was confirmed is immaterial.

paged me into her office. Ms. Gonzalez told me that she had talked to someone over her about my pregnancy, and that the bank was letting me go "because of [my] condition." When I told Ms. Gonzalez that I had intended to work at the bank until my baby was delivered, Ms. Gonzalez further stated that she calculated that I was going to have my baby sometime in July, and she needed someone to work the whole summer.

IV. I believe that I have been terminated from employment because of my pregnancy.

Complaint, Ex.A. In her deposition in August, 1997, she told substantially the same story. Maldonado testified that on March 3, 1997 she told Gonzalez that she was pregnant: "I told Amalia I just found out I'm pregnant, and then she told me okay. She told me she was going to have to talk to someone else at another bank, and that she'd get back to me." Maldonado Dep. at 53. The next day, Gonzalez fired her. Maldonado recounted the March 4 termination:

I went over to [Gonzalez's] desk, and she told me *due to your condition*, we're going to have to let you go because you're not going to be able to work the whole summer how we're going to need you. And then I told her that my physi-

cian had said it was okay that I was able to work up until the day I delivered my son because my pregnancy was going okay. And she told me, no, that she was going to have to find someone else. Because of my condition I wasn't going to be able to work how she wanted me to work.

*Id.* at 63 (emphasis added).[3] "She told me my termination was due to my condition," Maldonado repeated. *Id.* She also testified that she told Gonzalez that she "wasn't sure if [she] was going to keep [her] baby." *Id.* at 64–65. Maldonado left the bank that afternoon and later told her family for the first time about her pregnancy. *See id.* at 65. She gave birth to a son on July 22, 1997.

From the portions of her deposition testimony which have been included in the record,[4] it is impossible to reconstruct Gonzalez's exact account of these events. Suffice it to say, Gonzalez remembers things differently. At one point, she testified that she never asked Maldonado whether she would be unavailable to substitute for full-time tellers during the summer months. *See* Gonzalez Dep. at 118. At another point, however, she said that she *did* ask Maldonado whether she would be able cover the vacations, *see id.* at 119, and claimed, at yet another point in the deposition, that Maldonado had told her "that she wouldn't be able to cover vaca-

---

**3.** In ¶ 41 of her Rule 12(N) counter-statement of facts, Maldonado claimed that on March 3 she "informed Ms. Gonzalez that she was pregnant and that she could work up until her delivery date of July, 1997." In support of this statement, she cites pages 51 and 63 of her deposition. But page 51 includes only a clarification of the date of the pregnancy announcement (March 3) and page 63 includes a discussion of only the March 4 termination conversation, not the March 3 announcement conversation.

The bank denied most of the allegations in ¶ 41. (It admitted that Maldonado first announced her pregnancy on March 3.) The bank stated that it "denies that plaintiff told Mrs. Gonzalez that she could work up until

her delivery date. To the contrary, plaintiff told Mrs. Gonzalez that she wouldn't be able to fill in for vacations until after her baby was born and that she would need time off for her maternity." Defendant's Response to Plaintiff's Rule 12(N) Counter–Statement of Material Facts, at 11. The bank cited Gonzalez's deposition, pages 112–14, in support of this denial. Those pages of Gonzalez's deposition are not a part of the record on appeal. *See* note 4, *infra*.

**4.** The record on appeal contains only portions of Gonzalez's deposition and does not include all the pages cited by the parties in support of their arguments. The record below was apparently similarly limited.

tions," *id.* at 107.[5] Whatever she asked and whatever Maldonado then answered, Gonzalez later told a superior that Maldonado had said on March 3 that she would be unable to substitute for vacationing full-timers. *See id.* at 118–19. Gonzalez fired Maldonado the next day, she testified, "[b]ecause she told me that she wouldn't be able to cover vacations and I told her that that's the reason she was hired." *Id.* at 107. Gonzalez's affidavit, filed in support of the bank's motion for summary judgment, is more definite. There, she asserted: "On March 3, 1997, Jessica Maldonado first advised me that she was pregnant. She further informed me that she had been pregnant for approximately four months. Accordingly, it was anticipated that she would give birth in mid-July of 1997." Gonzalez Aff., ¶ 6. Gonzalez further stated that, like any other employee who was "unable to fulfill an essential condition of employment," she terminated Maldonado on March 4, 1997. *Id.* at ¶¶ 7–9.[6]

Viewing the evidence in the light most favorable to Maldonado, as we must on summary judgment, Maldonado has presented evidence which suggests that her termination was motivated at least in part by her pregnancy. Maldonado testified that Gonzalez told her she was being fired "due to her condition." This statement could be interpreted as an "acknowledgment of discriminatory intent by the [bank]." *Troupe*, 20 F.3d at 736. The comment was contemporaneous with her termination; it concerned the particular employment action at issue here; and it was uttered by the person with decision-making authority. *See, e.g., Indurante*, 160 F.3d at 367; *Venters*, 123 F.3d at 972–74. The inference of impermissible motivation flows directly from Gonzalez's statement.

█ The bank does not dispute that it fired Maldonado because she was pregnant. Instead, it argues that it discharged her because her pregnancy would make her unavailable during the summer months; it is impossible to separate Maldonado's job performance from her medical condition, the bank asserts. The bank is correct that an employer can dismiss an employee for excessive absenteeism, even if the absences were a direct result of the employee's pregnancy. *See, e.g., Troupe*, 20 F.3d at 738. This case raises a different issue, however, because there is no evidence that Maldonado had an attendance problem; the bank simply assumed that, because of her pregnancy, Maldonado would be absent from work for an indeterminate period sometime in the future.[7]

5. With the evidence we have, it is impossible to know whether this latter claim—that Maldonado said she would be unable to work during some summer months—came from the March 3 conversation, before the decision was made to fire her. We also have no basis for determining Gonzalez's characterization of Maldonado's response.

6. As discussed below, Gonzalez's supplemental affidavit concerns issues related to Maldonado's effort to prove that the bank's stated policy—part-timers must substitute for full-timers—was merely a pretext for firing her.

7. Thus, the bank's (and the district court's) reliance on *Marshall v. American Hosp. Ass'n*, 157 F.3d 520 (1998), is misplaced. In that case, when the American Hospital Association (AHA) hired Marshall, she was pregnant and due in June. She understood that one of her most important duties was to organize an AHA conference in September. Immediately after starting work, Marshall informed her bosses that she was pregnant and planned to take eight weeks leave after delivering her baby. *See id.* at 522–23. The AHA fired her several weeks later. This Court upheld the district court's grant of summary judgment in favor of the AHA because, in part, Marshall had produced no direct evidence and only insubstantial circumstantial evidence that the "AHA terminated her because of her pregnancy rather than because she was planning an extended absence during the busiest time of her first year" on the job. *Id.* at 527. In this case, there is a dispute about whether Maldonado was planning on an extended absence: Maldonado never testified that she asked for one; Gonzalez claimed that Maldonado did make such a request, but also testified that she (Gonzalez) simply anticipated an absence. We must credit Maldonado's evidence. So, in short, whereas Marshall asked for special treatment, Maldonado did not.

The question, then, is under what circumstances, if any, the bank's assumption would be justified.

■■■■■ There might be some limited circumstances in which an employer could be justified in taking anticipatory adverse action against a pregnant employee. Although the PDA was designed to allow individual women to make independent choices about whether to continue to work while pregnant, it was not designed to handcuff employers by forcing them to wait until an employee's pregnancy causes a special economic disadvantage. The PDA does not create such an artificial divide between pregnancy, childbirth and related medical conditions and the secondary effects of a pregnancy which might affect job performance. Pregnancy causes normal inconveniences that might "interrupt the workplace's daily routines," including, for example, the need to take more frequent snack and restroom breaks and the need to take some time off, at the very least, to give birth. Judith G. Greenberg, THE PREGNANCY DISCRIMINATION ACT: LEGITIMATING DISCRIMINATION AGAINST PREGNANT WOMEN IN THE WORKFORCE, 50 ME. L. REV. 225, 250 (1998); *see also In re Carnegie Center Associates*, 129 F.3d 290, 306 (3rd Cir.1997) (McKee, J., dissenting) (describing "the absence [from work] endemic to pregnancy"). An employer may, under narrow circumstances that we are not convinced are present here, project the normal inconveniences of pregnancy and their secondary effects into the future and take actions in accordance with and in proportion to those predictions. Of course, it will rarely be one hundred percent demonstrable that a pregnant woman will be unable

to meet a BFOQ sometime in the future. Cases such as *Marshall*, 157 F.3d at 522–23, in which an employee announces that she will be unavailable to work in the future and thus explicitly requests special treatment, are exceptional. It is not merely a question whether the pregnant employee asks for special treatment, however; other evidence might also be probative of the employee's ability to continue to meet the employer's legitimate job expectations. But an employer cannot take anticipatory action unless it has a good faith basis, supported by sufficiently strong evidence, that the normal inconveniences of an employee's pregnancy will require special treatment.

■■■■■ In this case, assuming summer availability is a BFOQ (something that Maldonado does not contest with respect to her particular job), did the bank have a good faith basis in the spring to believe, supported by sufficiently strong evidence, that Maldonado's pregnancy would result in her unavailability during the summer? Probably not.[8] By all accounts, the discussion between Gonzalez and Maldonado about Maldonado's ability to work through her pregnancy was brief and took place only after Gonzalez had announced the firing. Gonzalez declared in her affidavit that she merely "anticipated" that Maldonado would take leave and be unable to cover for vacationing full-time tellers. The factual basis for this assumption is hotly contested. Maldonado apparently did not ask for leave; nor did she request any other kind of special treatment. To the contrary, she indicated that she planned to work until she delivered and even intimated that she might not carry the fetus to

---

(Or, at the very least, there is a dispute about this material fact, and summary judgment must be denied on that ground.) Further, unlike Marshall, Maldonado has produced direct evidence that her termination was motivated by her pregnancy. *Marshall* does not support the bank's position.

8. Although the thesis has not been developed in this record, the bank might argue that it must have a part-time teller hired and trained

in the spring so that he or she will be prepared for and available in the summer. The bank might claim that, if Maldonado's availability is uncertain, it should not be required to carry two employees on the rolls to fill one part-time position. This, however, is not the argument that now confronts us; this contention merely illustrates the potential complexities of the problem.

term. Gonzalez, of course, testified that she believed that Maldonado would take pregnancy leave. Whether Gonzalez or Maldonado provided a more credible version of events is a judgment for a factfinder to make. On summary judgment, though, we must resolve this dispute in favor of Maldonado. Thus, the bank did not have sufficient specific evidence (apart from general assumptions about pregnancy) that Maldonado would require special treatment. Absent such evidence, the bank cannot terminate Maldonado simply because it "anticipated" that she would be unable to fulfill its job expectations. *See Troy v. Bay State Computer Group, Inc.,* 141 F.3d 378, 381 (1st Cir.1998) (affirming jury verdict in favor of terminated pregnant employee where employer "believed that she was likely thereafter to have a poor attendance record"); *Deneen v. Northwest Airlines, Inc.,* 132 F.3d 431, 437 (8th Cir.1998) (affirming jury verdict in favor of pregnant employee where employer did not allow her "to return to work before it was aware of [her] actual physical capabilities"). This is the exact sort of employment action that the PDA was designed to prevent. *See Sheehan,* 173 F.3d at 1045; *Johnson Controls,* 499 U.S. at 206, 111 S.Ct. 1196. Because there is a genuine issue of material fact about the reason the bank fired Maldonado, summary judgment was inappropriate.

## II.

Maldonado also complains about the district court's denial of her motion to strike Gonzalez's supplemental affidavit and the chart attached to it, a decision we review for abuse of discretion. *See, e.g., Bradley v. Work,* 154 F.3d 704, 707–08 (7th Cir.1998).

During discovery, Maldonado deposed Gonzalez and, afterward, requested the time-cards for all part-time tellers at the three branches managed by Gonzalez.

The bank produced some boxes (the exact number is disputed, but immaterial) which held time-cards from several branches, including those managed by Gonzalez. When she went to inspect these boxes, Maldonado's attorney asked for a list of the employees under Gonzalez's management in order to facilitate the sorting of the time-cards. The bank's attorney produced a list. Maldonado's attorney subsequently requested copies of only about half of the cards.

At the close of discovery, the bank moved for summary judgment, attaching a statement of material facts pursuant to Local Rule 12(M) and an affidavit of Gonzalez. Maldonado responded, attaching her own counter-statement of facts pursuant to Local Rule 12(N). The bank replied, including a supplemental affidavit of Gonzalez and a chart detailing the schedules of full- and part-time tellers, which purported to demonstrate that part-timers substituted for vacationing full-timers. Maldonado moved to strike the supplemental affidavit and chart, arguing that the chart was inadmissible and that the supplemental affidavit contradicted Gonzalez's deposition testimony.

The district court concluded that any differences between Gonzalez's affidavit and her deposition were "minor discrepancies;" it discovered "no point where Gonzalez misled [Maldonado's attorney] on a material fact." Dis. Ct. Op. and Order, at 6. It also found that the chart was reliable and admissible and that Maldonado had failed to "show any wrongdoing on the part of the bank regarding" production of the evidence which formed the basis for the chart. *Id.* at 5.

On appeal, Maldonado repeats the claims she advanced below, arguing, in short, that the supplemental affidavit should be stricken because it materially conflicts with Gonzalez's deposition[9] and

---

9. Specifically, Maldonado claims that: (1) Gonzalez had testified that a full-timer filled in for another full-time teller, but now

claimed a part-timer was the substitute; (2) Gonzalez changed the explanation for another part-timer's departure; and (3) Gonzalez

that the chart should be excluded because it is based on evidence which she requested but which the bank failed to produce. Maldonado was (and is still) attempting to contest the bank's assertion that, as a matter of bank policy, part-time tellers were required to substitute for full-timers.[10]

 Fed.R.Civ.P. 56(e) provides in pertinent part that the "court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits." Courts generally ignore attempts to patch-up potentially damaging deposition testimony with a supplemental affidavit unless the party offers a suitable explanation—e.g., confusion, mistake or lapse in memory—for the discrepancy. *See, e.g., Russell v. Acme–Evans Co.*, 51 F.3d 64, 67–68 (7th Cir.1995) (citing cases). Again, the district court has great discretion in making these determinations, and we find no abuse here.

Gonzalez offers appropriate explanations for any differences between her deposition and the supplemental affidavit. Maldonado's attorneys deposed Gonzalez prior to obtaining the detailed scheduling and personnel records; it appears that, as a result, they simply never asked about some of the evidence provided in Gonzalez's supplemental affidavit and its attachments. Many of the alleged discrepancies are only clarifications of previous testimony or constitute completely new testimony. Moreover, the supplemental affidavit indicates that Gonzalez adjusted her testimony only after consulting the bank's personnel files. The bank claims that the pertinent portions of these files were originally produced for inspection and were attached to the affidavit. They also appear to be reliable business records. Thus, Maldonado has no cause to complain about the chart or the "minor discrepancies" in the supple-

mental affidavit concerning teller schedules. We find it odd that Gonzalez would claim a year after the event (in the affidavit) that she *fired* a part-time teller because that teller had been unable to substitute for full-timers, when she testified only two months after the fact (in the deposition) that the teller had *quit*. This might be an important difference. But the district court closely compared the affidavit to the deposition and determined that any differences did not undermine the affidavit's legitimacy. On this record we cannot call this decision an abuse of discretion. We therefore affirm the district court's denial of Maldonado's motion to strike Gonzalez's supplemental affidavit and the attached chart.

### III.

 As we have emphasized, the record on appeal in this case was quite limited. It is possible that the bank has produced other evidence which might show that Maldonado asked for special considerations on account of her pregnancy (for example, pages 112–14 of Gonzalez's deposition). Even with this evidence, however, for the reasons we have already articulated, summary judgment would be inappropriate. The PDA makes it unlawful for an employer to assume that pregnant women will be less productive than other employees. In this case, Maldonado has produced evidence that the bank did just that when it fired her. Accordingly, the district court's order granting summary judgment in favor of the bank is Reversed. The district court's order denying Maldonado's motion to strike is Affirmed.

---

changed the job title of another supervisor. She also argues that the chart was unauthenticated.

10. Whether bank policy or not, Maldonado does not contest that her employment with the bank was based on her representation that

she would be able to substitute for vacationing full-time tellers during the summer months. Nor does Maldonado challenge the *bona fides* of this (at least) individual requirement.