In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-2294

CELENA VENTURELLI,

*Plaintiff-Appellant,*

*v.*

ARC COMMUNITY SERVICES, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01 C 912—**Rudolph T. Randa**, *Chief Judge.*

ARGUED DECEMBER 3, 2002—DECIDED JULY 16, 2003

Before EASTERBROOK, MANION, and EVANS, *Circuit Judges.*

MANION, *Circuit Judge.* Celena Venturelli, who was sev-eral months pregnant, worked for a temporary employment agency and was assigned to work for ARC Community Services, a social services agency principally devoted to helping women with various problems. Venturelli per-formed very well and ARC hoped to hire her full-time for a vacant administrative assistant position. But when one of her supervisors discussed the job with her, she was left with the impression that ARC would not hire her while she was pregnant, and she quickly lost interest in the job. She completed her predesignated term as a temporary

employee and departed, but she did not return ARC's calls after she left to have her baby. ARC eventually hired someone else. Venturelli then sued ARC for unlawful discrimination in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k). The district court granted ARC's motion for summary judgment. Venturelli appeals, and we affirm.

## I.

ARC Community Services, Incorporated (ARC) is a not-for-profit corporation that serves women involved with the criminal justice system, women who have drug problems, and women who are pregnant. In October 1999, the Adecco Employment Agency assigned Celena Venturelli, who was visibly pregnant and due to deliver in March 2000, to work at ARC as a receptionist. Adecco had an agreement with its clients, including ARC, that a temporarily-assigned employee ("temp") like Venturelli would have to work at least 520 hours before the employer could hire that person permanently. Violation of this agreement would subject the employer to a monetary penalty.

Venturelli arrived at ARC at a busy time. ARC was in the process of preparing two important grants that were essential for funding for the following year. Venturelli worked closely with Assistant Director Judy Baldwin in preparing one of those grants. Baldwin was very impressed with Venturelli's performance and suggested to Executive Director Karen Kinsey that Venturelli would be an excellent candidate for the administrative assistant's position that ARC was attempting to fill. At a meeting with Baldwin and Michael Collins, the ARC services comptroller, Kinsey concluded that they should offer

Venturelli the position. Since Collins was the person who was in charge of monitoring the temporary employees and keeping track of their time, Kinsey told Collins to meet with Venturelli and discuss the possibility of Venturelli taking the job.

That turned out to be an unfortunate assignment. On two occasions, one shortly before and one shortly after the Martin Luther King holiday in January 2000, Collins met with Venturelli in his office. Instead of simply offering her the job, Collins went into a detailed discussion about Venturelli's pregnancy and how she would deal with it in the event she took a permanent position with ARC. He made comments about how some women change their mind once they have the child in their arms. As he contends in his deposition, he was attempting to let Venturelli know that there would be no rush to come back to the job on a permanent basis. Instead, she would be able to take the time she thought was necessary to stay at home with her child. Collins may have thought he was being magnanimous when he suggested that Venturelli could change her mind about when and if she wanted to come to work full-time after she had the baby, but Venturelli was taken aback by this discussion. She interpreted Collins' comments about women and babies as an indication that ARC did not want to hire pregnant women. Although Venturelli was "shocked" by this conversation, she remained stoic and did not raise any objections to these references that she perceived as stereotyping working mothers.

A few days later, at the direction of Karen Kinsey, Judy Baldwin spoke with Venturelli, and she also stated that ARC was interested in hiring Venturelli for the job of administrative assistant. Venturelli responded to that overture by saying that she wanted to think about the matter and talk some more about it. Baldwin assumed

she wanted to talk it over with her husband and did not pursue the issue further. Venturelli did not get back to Baldwin with her response, and when Kinsey learned of this she simply assumed that they could not force Venturelli to take the job. Venturelli did not mention her concern about Collins' statements when she met with Baldwin, nor did she make any contact with Kinsey with the same complaints.

During Venturelli's meeting with Baldwin, they discussed insurance and whether pregnancy would be a preexisting condition under ARC's policy. Baldwin did not know, so she called ARC's insurance carrier while Venturelli was in the room. After attempting to contact two people who turned out not to be available, Baldwin talked with a third person at the insurance company, whom Baldwin cannot identify. That person, it turns out incorrectly, informed Baldwin that pregnancy was a preexisting condition. Baldwin passed on the information to Venturelli, thus implying that, if Venturelli were immediately to begin working for ARC full-time, her pregnancy would not be covered. As it was, Venturelli's husband was employed and she was then receiving benefits on his employer's medical plan. And, as Kinsey later acknowledged, putting Venturelli on ARC's medical plan would have had no impact on the organization's premiums.

After this conversation, Venturelli continued the remaining time at ARC in her temporary status. Her last day of work was February 24, a date she had set early on in anticipation of her March 12 due date. The office workers gave her a baby shower on that day, and then she left, never to return.

After Venturelli's departure, ARC officials made several attempts to contact her, but no one was able to reach

her personally and so they simply left voicemail messages. Venturelli purposely did not return those calls because, at that point, she had decided that she did not want to return to ARC. After remaining at home with her baby for about five months, Venturelli applied for, and obtained, employment with a different employer.

In the meantime, in hopes that Venturelli would accept the full-time administrative assistant position, ARC hired in succession two temporary employees to perform the job. However, after ARC finally did not hear back from Venturelli, it hired another person, Laura Schleif, for the full-time position. Schleif was pregnant at the time ARC expressed interest in hiring her, and ARC told her that she could begin the job after she delivered her baby. That is what Schleif did, even though she had left to have her baby before completing the 520-hour requirement. Schleif's hiring occurred at approximately the same time that Venturelli took a new job with a different corporation. As it turned out, Venturelli herself had met the 520-hour requirement on February 14, approximately ten days before her last day at ARC. The record does not show how much Venturelli would have been paid had she been given a full-time position sometime between February 14 and February 24. Nor is there any indication, had she taken a full-time position and had the expenses for the delivery of her child placed on ARC's medical plan, whether there would have been any difference in coverage of expenses from her husband's employer's medical plan.

Venturelli eventually filed a complaint with the Equal Employment Opportunity Commission, and then sued under Title VII, accusing ARC of refusing to hire her because she was pregnant. The district court granted ARC's motion for summary judgment and Venturelli appeals.

## I.

This court reviews the district court's grant of summary judgment *de novo*, construing all facts in favor of Venturelli, the nonmoving party. *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "[s]ummary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party*." Rogers*, 320 F.3d at 752.

Under Title VII, it is unlawful for most employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex. . . ." 42 U.S.C. § 2000e-2(a)(1). The phrase "because of sex" has been defined by the Pregnancy Discrimination Act (PDA), through which Congress amended Title VII in 1978, to mean "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). Venturelli's complaint is that ARC violated Title VII when it failed to hire her in January or February 2000 because of her pregnancy. As it is undisputed that ARC is an employer subject to Title VII, the question on appeal is whether a reasonable jury could conclude that ARC failed to hire Venturelli at some point because she was pregnant. She has available the direct method or the indirect method to prove her case. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

## A. The Direct Method

Under the direct method, there are two types of permissible evidence. First, there is direct evidence, or evidence that, if believed by the trier of fact, would prove the fact in question "without reliance on inference or presumption." *Rogers*, 320 F.3d at 753 (internal quotation omitted). Direct evidence "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Id.* (internal quotation omitted). For obvious reasons, we rarely encounter direct evidence. *Id.* The second type of evidence permitted under the direct method is circumstantial evidence, or evidence that allows a jury to infer intentional discrimination by the decisionmaker. *Id.*

### 1. Direct evidence.

Venturelli contends that "[t]he three key members of ARC's management team—Kinsey, Baldwin, and Collins—each provide direct proof" that ARC violated the PDA by refusing to hire her while she was pregnant. As to Kinsey, Venturelli first puts forth Collins' statement to the effect that Kinsey told him to offer Venturelli a job "when she came back" from delivering her baby. In Venturelli's view, this remark is direct evidence; i.e., it is tantamount to Kinsey's admission that ARC would not hire Venturelli because of pregnancy. We disagree. An offer of employment to a pregnant woman beginning some time after she delivers her baby does not, in itself, prove that the employer would hire that same woman immediately, but for her pregnancy. This information does not in any way equate to an admission of discrimination, and cannot be direct evidence of discrimination. We therefore conclude that there is no direct evidence in relation to Kinsey.

Nor is there any direct evidence attributable to Baldwin. Venturelli relies on page 59 of her own deposition to establish that "Baldwin told Venturelli that ARC was going to wait to hire her until she had her baby." What that reference actually refers to, however, is Venturelli's recalled conversation where she told the temp agency (Adecco) representative that she was interested in the position but "Mike Collins told me that they wanted me to wait until my pregnancy was over before they hired me." In her February 1 meeting with Baldwin, the discussion centered on insurance. There is no dispute that Venturelli had planned to leave ARC on February 24 in anticipation of her baby's birth. According to Venturelli, Baldwin told her ARC would like to offer her a job and a salary level, but that it would not be an advantage to her at that time because she would not be eligible for any benefits. At the time Venturelli was covered by her husband's employer's benefit program. It turned out that Baldwin's information on benefits was incorrect, but the point of the discussion was that Venturelli would continue her present job as a temp until her predesignated departure date (February 24) and return as a regular employee as the administrative assistant. There is no indication from Baldwin that ARC wouldn't hire Venturelli simply because she was pregnant.

That leaves Collins' message about new mothers and their desire to stay home with their babies. Assuming that Collins was a decisionmaker, which is a question we need not reach, the quoted statement could arguably constitute direct evidence. Collins, of course, casts this in a different light—his intent was not to rush her, and instead was to offer her all the time she needed before deciding to come back full-time. But even under Venturelli's interpretation, whether or not she would return was a valid concern. When Collins told Venturelli that they liked

her and wanted to hire her as the administrative assistant, but "we want to see how this pregnancy thing turns out," his concern was clearly not her pregnancy, but rather her willingness to come back and take on the new job. His remark that "[o]nce you hold that baby, you're just not going to come back to work" was a less than tactful way of expressing that ARC was willing to hold the job open to give her time to decide if she wanted to return.

In *Troupe v. May Dep't Stores Co.*, 20 F.3d 734 (7th Cir. 1994), we encountered an employer whose adverse employment action was motivated by the belief that the pregnant woman would not "return to work after her maternity leave was up," and held that discrimination so motivated did not violate the PDA because an employer can legitimately consider an employee's potential absence from work, even where that absence is because of pregnancy. *Troupe*, 20 F.3d at 737-38; *see also Rhett v. Carnegie Center Assoc. (In re Carnegie Center Assoc.)*, 129 F.3d 290, 297 (3d Cir. 1997) (following *Troupe*). Even though the same type of questions are presented here—after the baby is born, will Venturelli return to work and when?—Venturelli cites *Maldonado v. U.S. Bank*, 186 F.3d 759 (7th Cir. 1999), as narrowing *Troupe*'s holding to employees who, unlike Venturelli, had a poor attendance record during pregnancy. Not so. In *Maldonado*, the evidence showed that the employer admitted that the plaintiff was being fired "due to her [pregnant] condition." She was fired the day after she announced she was pregnant. *Maldonado* thus presented the unusual circumstance where the defendant apparently admitted liability, and thus the plaintiff was entitled to reach a jury with direct evidence. *Maldonado* did cite *Troupe* as authorizing an employee's dismissal even when excessive absences were a direct result of her pregnancy. But although Troupe's employer fired her the day before her pregnancy leave was

to begin, it was not because of past absences. "[S]he was terminated because her employer did not expect her to return to work after her maternity leave was up." *Troupe*, 20 F.3d at 737. Standing alone, that did not violate the PDA. *Id.* at 738. Venturelli wasn't fired. Rather, she continued to work, albeit as a temp, until her chosen last day of February 24. But as she recalls it, the discussion of her permanent position, something she initially wanted and ARC wanted her to have, hinged on whether (and when) she would want to come back. Unlike Maldonado, Venturelli presented no evidence that ARC said that it would not hire her because she was pregnant. Not only was she already pregnant while she was employed at ARC as a temp, but she had also declared she was leaving on February 24 to prepare for her baby's birth. According to Venturelli, Collins' statements show that ARC discriminated against her because it did not believe she would return to her job after pregnancy, and thus would not offer her a permanent position until it was assured of a time when she would return. In light of *Troupe*, even if ARC conditioned its offer of a permanent job as administrative assistant on if and when Venturelli would come back after having the baby, that is not direct evidence of a violation of the PDA.

Our dissenting colleague disagrees, arguing that this case is controlled by *Maldonado*, and not *Troupe*, because "the effect of Collins' uncorroborated belief that Venturelli would not want to work makes *Maldonado* a more appropriate comparison." On two main points, we disagree. First, the dissent's interpretation of *Troupe* is unduly confined. The holding of *Troupe* is straightforward: an employer may, without violating the PDA, terminate or not hire a woman because it does "not expect her to work after her maternity leave" ends. *Id.* at 737-38. Nothing in *Troupe*

says that the employer's expectation that the employee would not return to work *must* be corroborated.

Second, even if *Troupe* only applied where the employer's expectation was corroborated, it would still apply here. The dissent correctly notes that "[i]f Venturelli had told Collins that she wasn't sure if she wanted to return to work after giving birth, ARC would have been justified in searching for another employee." While we certainly agree with that observation, in this case Venturelli's actions were tantamount to telling ARC that "she wasn't sure if she wanted to return to work after giving birth."

As Venturelli admitted in her deposition, even after the meeting between Venturelli and Collins, Judy Baldwin had met with Venturelli and "said that she would like to offer [Venturelli] the admin assistant job," but that Venturelli would not be eligible for medical insurance to cover her pregnancy. Baldwin's statement, if not itself a job offer (the district court concluded it was), was exceedingly close to being one. Anyone who was in Venturelli's position, and who wanted the job, would have understood that this was an obvious opportunity to express interest in accepting the position. Venturelli, however, remained silent, neither expressing an intention to accept the job as soon as possible, nor telling Baldwin that she understood Collins' insensitive comments to mean that ARC would not hire her while she was pregnant. (Either choice likely would have nipped this dispute in the bud.) Silence in these circumstances was corroboration of ARC's concern that Venturelli would not resume working after her maternity leave, as was Venturelli's later refusal to return ARC's telephone calls about the job.

Moreover, our analysis is not, as the dissent apprehends, "only a small step" away from the conclusion that companies may "avoid hiring women of childbearing

age altogether out of a fear that the women will some
day become pregnant, take a substantial amount of time
off, and perhaps never want to return to work at all." To say
the least, that is a giant step away from our holding in
this case. Our dissenting colleague is absolutely correct
that refusing to hire a woman of childbearing age simply
for fear that she might have a baby violates Title VII, and
nothing in this opinion endorses anything of the sort.

### 2.  Circumstantial evidence under the direct method.

As discussed above, circumstantial evidence under the
direct method allows a jury to infer intentional discrimina-
tion by the decisionmaker. There are three categories of
circumstantial evidence under the direct approach, each of
which may suffice by itself to establish discrimination,
or may be used in conjunction with one or both of the
other categories. *Troupe*, 20 F.3d at 736. The first category
consists of "suspicious timing, ambiguous statements
oral or written, behavior toward or comments directed at
other employees in the protected group, and other bits
and pieces from which an inference of discriminatory
intent might be drawn." *Id.* The second type requires a
showing that the employer systematically treated other,
similarly situated, non-pregnant employees better. *Id.* The
third type is evidence that the plaintiff was qualified for
the position in question but passed over in favor of a per-
son not having the forbidden characteristic and that the
employer's stated reason for its decision is "unworthy of
belief, a mere pretext for discrimination." *Id.* The latter
category "is substantially the same as the evidence re-
quired" under the indirect method. *Huff v. UARCO, Inc.*,
122 F.3d 374, 380 (7th Cir. 1997).

Venturelli puts forth what she considers two "addi-
tional bits of evidence that lend circumstantial support to

an inference of discrimination." First, she cites ARC's "schizophrenic . . . assessment of Venturelli's value as an employee." According to Venturelli, although ARC often praised Venturelli's performance, in a letter from its attorney to the Wisconsin Equal Rights Division it also complained falsely that Venturelli (1) failed to work a forty-hour week; (2) worked an inconsistent number of hours; (3) "simply stopped coming to work after February 24, 2000"; and (4) "failed to inform ARC and Adecco that she had no intention of returning to work." Venturelli relies on *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1049 (7th Cir. 2000), for the proposition that where the employer makes false statements about an employee's job performance, "a jury is entitled to view the false statements as circumstantial evidence of a discriminatory intent."

Venturelli misplaces her reliance on *Hasham*. The part of *Hasham* to which she cites holds that contradictory statements about the quality of an employee's work are evidence that the employer's stated reason for the adverse employment action was pretextual *under the indirect method. Id.* Circumstantial evidence under the direct method, however, must allow a jury to infer more than pretext; it must itself show that the decisionmaker acted because of the prohibited animus. None of the statements to which Venturelli points fits within any of the three categories that we delineated in *Troupe*. All that these statements show is that, in addition to its praise of Venturelli's work, ARC also offered some additional observations. In fact, there is no dispute that as a temp she worked less than 40 hours per week, that the hours worked were somewhat irregular, that she did stop coming to work after February 24, and that she did not return several calls of inquiry from ARC regarding her intent to return. Significantly, the attorney's letter emphasized

that they wanted to hire her after the 520-hour penalty period ended, but because of her irregular hours it was not certain when that time period would expire. She left before they had that calculation. In short, the record verifies the facts set out in a letter that is mislabeled schizophrenic.

The second piece of circumstantial evidence to which Venturelli points is Baldwin's telephone conversation with ARC's insurance carrier, made in Venturelli's presence, where Baldwin relayed incorrect information that Venturelli would not be eligible for health benefits were ARC to hire her immediately. Venturelli argues that the record would allow a jury (1) to conclude that Baldwin was lying, as opposed to relying honestly on what the insurance company told her, and (2) to infer that "the lie could only have been intended to discourage Venturelli from pursuing employment at ARC during her pregnancy."

For such a statement to be sufficient circumstantial evidence under the direct method, the remark in question must be "directly related to the employment decision." *Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001). Venturelli, however, adduces no evidence that Baldwin's alleged lie about the insurance was in any way related to ARC's decision not to hire her as of January or February 2000. The only record evidence concerning the incorrect information that pregnancy was an uninsured preexisting condition is Karen Kinsey's testimony that including Venturelli on ARC's insurance coverage would have no effect "because our health insurance costs us the same whether someone is pregnant or not pregnant." We thus conclude that this piece of evidence does not entitle Venturelli to reach a jury under the direct method. Because Venturelli puts forth no further evidence under the direct method, we turn to her evidence in relation to the indirect method.

**B. Indirect Method**

Under the indirect method of proof, a plaintiff must first establish a prima facie case of discrimination. To make a prima facie case, Venturelli must show that: (1) she was pregnant; (2) she applied and was qualified for the position sought; (3) she was rejected; and (4) the position remained open and ARC continued to seek applicants from persons of Venturelli's qualifications. *Heerdink v. Amoco Oil Co.*, 919 F.2d 1256, 1259 (7th Cir. 1990). An alternate means of proving prong four is to establish that someone who was not pregnant received more favorable treatment. *Mills v. Health Care Servs. Corp.*, 171 F.3d 450, 454 (7th Cir. 1999) (citing *E.E.O.C. v. Our Lady of Resurrection Med. Center*, 77 F.3d 145, 148 (7th Cir. 1996)). If Venturelli were to establish a prima facie case, to avoid liability ARC would then have to come forward with a non-invidious reason for its decision. *Rogers*, 320 F.3d at 755. If ARC were to meet its burden of production, to avoid summary judgment Venturelli would then have the burden to present competent evidence that the proffered non-discriminatory explanation is pretextual.

No dispute exists regarding the first two elements of the prima facie case. The third element is not so clear. The district court held, and ARC argues, that Venturelli does not meet prong three because ARC did, in fact, offer her the job. A review of the record underscores how the parties were not connecting in their communications with each other. Clearly ARC wanted to hire Venturelli as the administrative assistant. However, Collins' ramblings about motherhood apparently reduced or even eliminated Venturelli's desire to accept a permanent job at ARC. Unfortunately she said nothing to Collins, Baldwin or Kinsey about her concern of a perceived negative attitude toward pregnant employees at ARC (an organiza-

tion whose mission included helping pregnant women). Further muddying the picture was the projected expiration of the 520-hour penalty period that would enable ARC to hire Venturelli. But when Venturelli met with Collins and later Baldwin, the date of the expiration of that time period had not yet been determined. As was later calculated, that expiration date was February 14, ten days before Venturelli's chosen departure date of February 24. So while there apparently was an offer made by ARC for Venturelli to be administrative assistant after the time off she needed after she had her baby, there is no indication in light of the evidence favorable to Venturelli of an offer to hire her during that ten-day period before she voluntarily left the temporary assignment at ARC.

But that gap does not nail down the third element for Venturelli—that she was not hired because she was pregnant. Not only did she remain silent when, at two separate meetings, Collins made what she concluded were offensive comments; she said nothing about her concerns at her subsequent meeting with Baldwin, an undisputed employment decisionmaker, when the hiring discussion digressed into whether pregnancy was a preexisting condition under ARC's benefits package. Nor did she return Kinsey's call (to discuss the administrative assistant position), a clear opportunity to raise her concern with ARC's executive director. Their response would have presented evidence of whether they would or would not have hired her (or even if she wanted to be hired) during that ten-day period while she was pregnant. All that remains is Venturelli's conjecture of what Collins meant when he expressed concern about whether and when Venturelli would return to ARC after she had the baby. That is not enough.

Venturelli's claim falls short under the fourth element as well. For the fourth element of the prima facie case, we determine whether the position remained open and ARC continued to seek applicants from persons of Venturelli's qualifications. In her opening brief, Venturelli contends that she meets prong four because ARC "continued to seek applicants for the position." The undisputed evidence, however, is to the contrary. In December 1999, with the decision to offer the administrative assistant position to Venturelli, ARC canceled all advertising for that vacancy. Even after its final communications with Venturelli in February 2000, when any rejection would have had to have been made, ARC continued for several months to staff the position of permanent administrative assistant with temporary employees in anticipation that Venturelli would eventually fill the position. There is no evidence in the record that ARC continued seeking applicants. It was only after June 2000, after several attempts to contact Venturelli and months of not hearing back from her, that ARC sought new applications for the position of administrative assistant. Thus, even if ARC had, in fact, rejected Venturelli for the position in January or February 2000, there is not a shred of evidence that it then *continued* to seek applicants for the permanent post of administrative assistant from people of Venturelli's qualifications.

Venturelli also argues that she can satisfy prong four by showing that ARC treated someone who was not pregnant more favorably, pointing specifically to ARC's process for hiring Laura Schleif beginning in August 2000, roughly five months after Venturelli had ceased job-related contacts with ARC. This argument fails because Venturelli points to no evidence that would allow a jury to conclude that ARC treated Schleif any more favorably than it treated Venturelli. Like Venturelli, Schleif was preg-

nant and a temporary employee when ARC decided to hire her as an administrative assistant. As it had advised Venturelli, ARC told Schleif that she could begin the job after she had her baby. The only difference between Schleif and Venturelli is that Schleif was apparently hired before she completed the 520-hour requirement. Had Venturelli, like Schleif, chosen to accept the full-time position after delivering her baby, she too could have returned to ARC as soon thereafter as she desired. In other words, Venturelli and Schleif were, in all relevant aspects, treated the same: ARC would have allowed either to begin working in the permanent administrative assistant position after she had delivered her baby. In no sense can ARC be said to have treated Schleif any more favorably than it had treated Venturelli.

We hold that, because Venturelli cannot establish the third or fourth elements of the prima facie case, she is not entitled to reach a jury via the indirect method of proving a Title VII violation.

## III.

From start to finish this is an unfortunate sequence of events. ARC wanted to hire Venturelli as administrative assistant and at some point she wanted the job. But communications broke down when Collins callously muddled a job offer by referring to his perceptions of mothers and their new babies. Although Venturelli was offended, she said nothing to Collins, nor did she discuss her concerns with Kinsey or Baldwin. She left the temporary job as scheduled and never returned calls about the job. Venturelli does not present direct or circumstantial evidence sufficient to proceed under the direct method of proving discrimination. Also, she is unable to produce

evidence under the indirect method for establishing the third or fourth elements of a prima facie case. We therefore AFFIRM the district court.

EVANS, *Circuit Judge*, dissenting. When evaluating cases under the Pregnancy Discrimination Act, we must determine whether an employer treated a pregnant employee as it would have treated a "similarly affected but nonpregnant employee[ ]." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994). But pregnancy is unique, often making that seemingly simple task a difficult one. This case demonstrates why it doesn't always work just to ask whether an employer would treat a similarly affected but nonpregnant employee any differently.

According to Celena Venturelli's story (which, at the summary judgment stage, we must accept as true), she told Michael Collins in January that she wanted the job. Collins didn't hide the fact that her pregnancy—specifically the question of whether she would return to work after having her baby—was the major cause of ARC's hesitation. "We want to wait," he told her, because "we want to see how this pregnancy thing turns out. . . .  I know how you women are. Once you have that baby, you're not going to want to return."

My colleagues consider Collins' belief that Venturelli would not want to come back to work to be "a valid concern," and certainly an employer who is not sure when or if an employee will return to work has a valid concern and can act accordingly—to paraphrase our example in

*Troupe* (comparing the pregnant plaintiff there to a hypo-thetical black employee in need of a kidney transplant), a baseball team can cut a black second baseman with a bum knee without giving rise to a claim of racial discrim-ination if it is not sure when or if the knee will recover. What makes our case different, however, is that Collins never worried that Venturelli would be physically unable to return to work, just that she would be unwilling to do so. And Collins' concern arose not from anything Venturelli said, but from general notions about pregnant women and new mothers.

If an employer is allowed to take action based solely on the stereotype that new mothers are unlikely to return to work, it requires only a small step for companies to avoid hiring women of childbearing age altogether out of a fear that the women will some day become pregnant, take a substantial amount of time off, and perhaps never want to return to work at all. "I know how you women are," an employer might tell a newly married applicant. "You decide it's time to have a child, then once you have that baby, you're not going to want to return." Em-ployers cannot refuse to hire a woman because they fear that she will have children and choose not to return to work—that's precisely the type of discrimination the PDA was designed to prevent. *See Maldonado v. U.S. Bank*, 186 F.3d 759, 763 (7th Cir. 1999) ("[Congress] designed the PDA specifically to address the stereotype that 'women are less desirable employees because they are liable to become pregnant.' " (quoting *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1045 (7th Cir. 1999))).

As my colleagues point out, *Troupe*, in which we found that an employer did not violate the PDA in terminating an employee because it "did not expect her to return to work after her maternity leave was up" seems to offer

protection to ARC. 20 F.3d at 737. But the effect of Collins' uncorroborated belief that Venturelli would not want to return to work makes *Maldonado* a more appropriate comparison. Because of her pregnancy, the plaintiff in *Troupe* was habitually late, and we assumed that the employer was reluctant to pay the plaintiff during her maternity leave. With those concerns, we were able to compare the plaintiff's situation to that of a similarly situated nonpregnant employee.

> We must imagine a hypothetical Mr. Troupe, who is as tardy as Ms. Troupe was, also because of health problems, and who is about to take a protracted sick leave growing out of those problems at an expense to Lord & Taylor equal to that of Ms. Troupe's maternity leave. If Lord & Taylor would have fired our hypothetical Mr. Troupe, this implies that it fired Ms. Troupe not because she was pregnant but because she cost the company more than she was worth to it.

20 F.3d at 738. As a result, *Troupe* asked but never had to answer the question of whether an employer could fire an employee solely because of his general belief that women will not return to work after their children are born.

*Maldonado*, on the other hand, did not differ from *Troupe* simply because the employer there "admitted liability," as my colleagues contend. In fact, *Maldonado* raised a different issue—the employee there was fired simply because the employer assumed that she would be absent from work in the future. As a result, we reversed the district court's grant of summary judgment in favor of the employer.

> There might be some limited circumstances in which an employer could be justified in taking anticipatory

adverse action against a pregnant employee. Although the PDA was designed to allow individual women to make independent choices about whether to continue to work while pregnant, it was not designed to handcuff employers by forcing them to wait until an employee's pregnancy causes a special economic disadvantage. . . . But an employer cannot take anticipatory action unless it has a good faith basis, supported by sufficiently strong evidence, that the normal inconveniences of an employee's pregnancy will require special treatment.

186 F.3d at 767. Similarly, ARC cannot take the anticipatory action of refusing to hire a pregnant woman because it is not sure she will return to work unless that assumption is supported by more than a stereotypical belief that new mothers will not leave their infants. If Venturelli had told Collins that she wasn't sure if she would return to work after giving birth, ARC would have been justified in searching for another employee. In that case, the comparison to a different medical condition works, and ARC only would have had to have hired Venturelli if it would have hired a nonpregnant worker who wanted to take an indefinite and potentially permanent leave soon after being hired. But that is not the justification ARC has made at this point, instead claiming only that it didn't treat Venturelli any differently because she was pregnant. Collins' statements provide Venturelli with enough evidence to let a jury decide whether that is true. I would reverse the grant of summary judgment and remand this case for trial.

No. 02-2294                                                    23

A true Copy:

     Teste:

                          _____
                          *Clerk of the United States Court of*
                             *Appeals for the Seventh Circuit*