# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 02-2294

CELENA VENTURELLI,

*Plaintiff-Appellant,*

v.

ARC COMMUNITY SERVICES, INC.,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01 C 912—**Rudolph T. Randa**, *Chief Judge.*

_____

ARGUED DECEMBER 3, 2002—DECIDED NOVEMBER 26, 2003
ON RESUBMISSION[*]

_____

Before EASTERBROOK, MANION, and EVANS, *Circuit Judges.*

MANION, *Circuit Judge.* Celena Venturelli, who was
several months pregnant, worked for a temporary employ-

_____

[*] This court originally affirmed the decision of the district court
in *Venturelli v. ARC Community Services, Inc.*, 336 F.3d 606 (7th Cir.
2003). However, we subsequently granted Ms. Venturelli's
petition for rehearing and vacated our original opinion. This re-
vised opinion has been circulated among all active judges pur-
suant to the petition for rehearing en banc (Judge Coffey and
Judge Ripple did not participate in the consideration or decision
of the petition). No judge favored a rehearing. We are issuing this
revised opinion without additional oral argument.

ment agency and was assigned to work for ARC Community Services, a social services agency principally devoted to helping women with various problems. Venturelli performed very well and ARC hoped to hire her full time for a vacant administrative assistant position. But when one of her supervisors discussed the job with her, she was left with the impression that ARC would not hire her while she was pregnant, and she quickly lost interest in the job. She completed her predesignated term as a temporary employee and departed, but she did not return ARC's calls after she left to have her baby. ARC eventually hired someone else. Venturelli then sued ARC for unlawful discrimination in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k). The district court granted ARC's motion for summary judgment. Venturelli appeals, and we affirm.

## I.

ARC Community Services, Incorporated (ARC) is a not-for-profit corporation that serves women involved with the criminal justice system, women who have drug problems, and women who are pregnant. In October 1999, the Adecco Employment Agency assigned Celena Venturelli, who was visibly pregnant and due to deliver in March 2000, to work at ARC as a receptionist. Adecco had an agreement with its clients, including ARC, that a temporarily assigned employee ("temp") like Venturelli would have to work at least 520 hours before the employer could hire that person permanently. Violation of this agreement would subject the employer to a monetary penalty.

Venturelli arrived at ARC at a busy time. ARC was in the process of preparing two important grants that were essential for funding for the following year. Venturelli worked

closely with Assistant Director Judy Baldwin in preparing one of those grants. Baldwin was very impressed with Venturelli's performance and suggested to Executive Director Karen Kinsey that Venturelli would be an excellent candidate for the administrative assistant position that ARC was attempting to fill. At a meeting in January 2000 with Baldwin and Michael Collins, the ARC services comptroller, Kinsey concluded that they should offer Venturelli the position. Since Collins was the person who was in charge of monitoring the temporary employees and keeping track of their time, Kinsey told Collins to meet with Venturelli and discuss the possibility of Venturelli taking the job.[1]

That turned out to be an unfortunate assignment. On two occasions, one shortly before and one shortly after the Martin Luther King holiday in January 2000, Collins met with Venturelli in his office. Instead of simply offering her the job, Collins went into a detailed discussion about Venturelli's pregnancy and how she would deal with it in the event she took a permanent position with ARC. He made comments about how some women change their mind once they have the child in their arms. As he contends in his deposition, he was attempting to let Venturelli know that there would be no rush to come back to the job on a permanent basis. Instead, she would be able to take the time she thought was necessary to stay at home with her child. Collins may have thought he was being magnanimous when he suggested that Venturelli could change her mind about when and if she wanted to come to work full time after she

---

[1] According to the deposition testimony of both Kinsey and Baldwin, Kinsey had ordered Collins to offer Venturelli the job. In Collins' deposition testimony, however, he recalled that Kinsey had told him "to tell [Venturelli] that she had a job when she came back."

had the baby, but Venturelli was taken aback by this discussion. She interpreted Collins' comments about women and babies as an indication that ARC did not want to hire pregnant women. Although Venturelli was "shocked" by this conversation, she remained stoic and did not raise any objections to these references that she perceived as stereo-typing working mothers.

A few days later, at the direction of Kinsey, Baldwin spoke with Venturelli, and she also stated that ARC was interested in hiring Venturelli for the job of administrative assistant. Venturelli responded to that overture by saying that she wanted to think about the matter and talk some more about it. Baldwin assumed she wanted to talk it over with her husband and did not pursue the issue further. Venturelli did not get back to Baldwin with her response, and when Kinsey learned of this she simply assumed that they could not force Venturelli to take the job. Venturelli did not mention her concern about Collins' statements when she met with Baldwin, nor did she make any contact with Kinsey with the same complaints.

During Venturelli's meeting with Baldwin, they discussed insurance and whether pregnancy would be a preexisting condition under ARC's policy. Baldwin did not know, so she called ARC's insurance carrier while Venturelli was in the room. After attempting to contact two people who turned out not to be available, Baldwin talked with a third person at the insurance company, whom Baldwin cannot identify. That person informed Baldwin, it turns out incorrectly, that pregnancy was a preexisting condition. Baldwin passed on the information to Venturelli, thus implying that, if Venturelli were immediately to begin working for ARC full time, her pregnancy would not be covered. As it was, Venturelli's husband was employed and she was then receiving benefits on his employer's medical

plan. And, as Kinsey later acknowledged, putting Venturelli on ARC's medical plan would have had no impact on the organization's premiums.

After this conversation, Venturelli continued the remaining time at ARC in her temporary status. Her last day of work was February 24, a date she had set early on in anticipation of her March 12 due date. The office workers gave her a baby shower on that day, and then she left, never to return.

After Venturelli's departure, ARC officials made several attempts to contact her, but no one was able to reach her personally and so they simply left voicemail messages. Venturelli purposely did not return those calls because, at that point, she had decided that she did not want to return to ARC. After remaining at home with her baby for about five months, Venturelli applied for, and obtained, employment with a different employer.

In the meantime, in hopes that Venturelli would accept the full-time administrative assistant position, ARC hired in succession two temporary employees to perform the job. However, after ARC finally did not hear back from Venturelli, it hired another person, Laura Schleif, for the full-time position. Schleif was pregnant at the time ARC expressed interest in hiring her, and ARC told her that she could begin the job after she delivered her baby. That is what Schleif did, even though she had left to have her baby before completing the 520-hour requirement. Schleif's hiring occurred at approximately the same time that Venturelli took a new job with a different corporation. As it turned out, Venturelli herself had met the 520-hour requirement on February 14, approximately ten days before her last day at ARC. The record does not show how much Venturelli would have been paid had she been given a full-time position sometime between February 14 and February 24.

Nor is there any indication, had she taken a full-time position and had the expenses for the delivery of her child placed on ARC's medical plan, whether there would have been any difference in coverage of expenses from her husband's employer's medical plan.

Venturelli eventually filed a complaint with the Equal Employment Opportunity Commission and then sued under Title VII, accusing ARC of refusing to hire her because she was pregnant. The district court granted ARC's motion for summary judgment and Venturelli appeals.

## II.

This court reviews the district court's grant of summary judgment de novo, construing all facts in favor of Venturelli, the nonmoving party. *Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "[s]ummary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party." *Rogers*, 320 F.3d at 752.

Under Title VII, it is unlawful for most employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex. . . ." 42 U.S.C. § 2000e-2(a)(1). The phrase "because of sex" has been defined by the Pregnancy Discrimination Act (PDA), through which Congress amended Title VII in 1978, to mean "because of or on the basis of pregnancy, childbirth, or

related medical conditions." 42 U.S.C. § 2000e(k). Venturelli's complaint is that ARC violated Title VII when it failed to hire her in January or February 2000 because of her pregnancy. As it is undisputed that ARC is an employer subject to Title VII, the question on appeal is whether a reasonable jury could conclude that ARC failed to hire Venturelli at some point because she was pregnant. She has available the direct method or the indirect method to prove her case. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

## A. The Direct Method

Under the direct method, there are two types of permissible evidence. First, there is direct evidence, or evidence that, if believed by the trier of fact, would prove the fact in question "without reliance on inference or presumption." *Rogers*, 320 F.3d at 753 (internal quotation omitted). Direct evidence "essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Id.* (internal quotation omitted). For obvious reasons, we rarely encounter direct evidence. *Id.* The second type of evidence permitted under the direct method is circumstantial evidence, or evidence that allows a jury to infer intentional discrimination by the decisionmaker. *Id.*

### 1. Direct evidence.

Venturelli contends that "[t]he three key members of ARC's management team—Kinsey, Baldwin, and Collins—each provide direct proof" that ARC violated the PDA by refusing to hire her while she was pregnant. As to Kinsey, Venturelli first puts forth Collins' statement to the effect that Kinsey told him to offer Venturelli a job "when

she came back" from delivering her baby. In Venturelli's view, this remark is direct evidence; i.e., it is tantamount to Kinsey's admission that ARC would not hire Venturelli because of pregnancy. We disagree. An offer of employment to a pregnant woman beginning some time after she delivers her baby does not, in itself, prove that the employer would hire that same woman immediately, but for her pregnancy. This information does not in any way equate to an admission of discrimination and cannot be direct evidence of discrimination. We therefore conclude that there is no direct evidence in relation to Kinsey.

Nor is there any direct evidence attributable to Baldwin. To begin with, there is no dispute that Venturelli had planned to leave ARC on February 24 in anticipation of her baby's birth, so clearly any decision about hiring her for a permanent position had to take into account her forthcoming absence. In her February 1 meeting with Baldwin, the discussion centered on insurance. It is not clear from Venturelli's testimony who raised the subject (Baldwin said Venturelli did). Baldwin told her ARC would like to offer her a job and a salary level, but that it would not be an advantage to her at that time because she would not be eligible for any benefits. At the time Venturelli was covered by her husband's employer's benefit program. As discussed above, it turned out that Baldwin's information on benefits was incorrect,[2] but the point of the discussion was that

---

[2] Venturelli now asserts that this erroneous report from the insurance company was a "lie" used as an excuse not to hire her while she was pregnant. Venturelli's own evidence negates that theory. Venturelli wrote in her handwritten account of her meeting with Collins on Thursday, January 13, 2000, that she had told him that she "had ins[urance] through where [her husband]
(continued...)

Venturelli would continue her present job as a temp until her predesignated departure date (February 24) and return as a regular employee as the administrative assistant. There is no indication from Baldwin that ARC wouldn't hire Venturelli simply because she was pregnant.

That leaves Collins' message about new mothers and their desire to stay home with their babies. As discussed above, for Collins' comments to constitute direct evidence he would have had to have been a decisionmaker. "A decisionmaker is the person responsible for the contested decision." *Rogers*, 320 F.3d at 754 (internal quotation omitted). Here, the contested decision was the alleged determination not to hire Venturelli for a position on the permanent clerical staff at ARC. The undisputed evidence establishes that Collins himself lacked the authority to make this decision: both Kinsey and Collins testified that Collins did not have the power to hire, or to decide not to hire, Venturelli.

To show that Collins was a decisionmaker, Venturelli refers to the deposition testimony of Collins, in which he stated that, as comptroller, he was part of the ARC management team, that he regularly consulted with Kinsey and Baldwin, and that Kinsey often asked for his input into management decisions. None of this shows that Collins was responsible for the decision to hire or not to hire Venturelli. Proving that Collins had input into ARC applicants' qualifications does not establish that he had any responsibility for the actual decision to hire Venturelli. Still, Venturelli points to Kinsey's deposition where she testified that she had

---

[2] (...continued)
worked, and [she] would stay w/that ins[urance] until after the baby was born then switch to ARC." Thus any discussion about pregnancy being a preexisting condition is totally irrelevant.

relied upon Collins' advice at her meeting in January with Baldwin and Collins regarding Venturelli's hiring. Kinsey said that "we clearly made a decision that we were going to hire Venturelli." Significantly, this underscores the fact that the decision was to hire Venturelli. Only if Collins had recommended that Venturelli *not* be hired, and Kinsey had followed that recommendation, would this reference make any sense. Obviously Kinsey's testimony would not allow a reasonable jury to find that Collins was a decisionmaker in the alleged decision *not* to hire Venturelli while she was pregnant. What Kinsey actually said was that, at the January meeting, she had relied on the advice of Collins and then, at the end of that meeting, had made the decision that "We would like to hire [Venturelli] as soon as possible." No doubt Collins likely influenced Kinsey's decision to hire her, which is certainly not an adverse employment action. Collins apparently dropped the ball when he met with Venturelli to offer her the job. But it was Kinsey's decision that he was supposed to deliver, not his.

Sometime thereafter Kinsey directed Baldwin to talk to Venturelli "to make sure she understood the job offer had been made and to try to pin it down" because "she didn't understand why that hadn't been accomplished." But when Baldwin did meet with Venturelli about the job, Venturelli said she had to talk about it (presumably with her husband). When Baldwin told Kinsey about the results of the meeting, Kinsey's reply was "Well, [we] can't force her to accept the job."

In her own testimony, Venturelli explained why she did not want to tell Kinsey or Baldwin about Collins' comments. She wanted to "tuck it away" and in anticipation of the baby did not want to "risk getting high blood pressure." She did not want to bring it up "while I was pregnant or while I was a first-time mom." Instead of accepting (or rejecting) what

was obviously a job offer, she chose to put it off because she was not willing to commit under the existing circumstances. And after she left to have her baby, she refused to return calls from ARC because she "did not want to work for an employer that would discriminate against a pregnant woman." But her undisclosed perception notwithstanding, there is absolutely no evidence in the record that the decisionmakers, Kinsey and Baldwin, refused to hire her because she was pregnant.

### 2.  Circumstantial evidence under the direct method.

Although there is no direct evidence of discrimination, Venturelli claims these are "bits of evidence that lend circumstantial support to inferences of discrimination." There are three categories of circumstantial evidence under the direct approach, each of which may suffice by itself to establish discrimination, or may be used in conjunction with one or both of the other categories. *Troupe*, 20 F.3d at 736. The first category consists of "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Id.* The second type requires a showing that the employer systematically treated other, similarly situated, non-pregnant employees better. *Id.* The third type is evidence that the plaintiff was qualified for the position in question but passed over in favor of a person not having the forbidden characteristic and that the employer's stated reason for its decision is "unworthy of belief, a mere pretext for discrimination." *Id.* The latter category "is substantially the same as the evidence required" under the indirect method. *Huff v. UARCO, Inc.*, 122 F.3d 374, 380 (7th Cir. 1997).

As circumstantial evidence, Venturelli first cites ARC's

"schizophrenic . . . assessment of Venturelli's value as an employee." According to Venturelli, although ARC often praised Venturelli's performance, in a letter from its attorney to the Wisconsin Equal Rights Division, it also complained falsely that Venturelli (1) failed to work a forty-hour week; (2) worked an inconsistent number of hours; (3) "simply stopped coming to work after February 24, 2000"; and (4) "failed to inform ARC and Adecco that she had no intention of returning to work." Venturelli relies on *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1049 (7th Cir. 2000) for the proposition that where the employer makes false statements about an employee's job performance, "a jury is entitled to view the false statements as circumstantial evidence of a discriminatory intent."

Venturelli misplaces her reliance on *Hasham*. The part of *Hasham* to which she cites holds that contradictory statements about the quality of an employee's work are evidence that the employer's stated reason for the adverse employment action was pretextual *under the indirect method. Id.* Circumstantial evidence under the direct method, however, must allow a jury to infer more than pretext; it must itself show that the decisionmaker acted because of the prohibited animus. None of the statements to which Venturelli points fits within any of the three categories that we delineated in *Troupe.* All that these statements show is that, in addition to its praise of Venturelli's work, ARC also offered some additional observations. In fact, there is no dispute that as a temp she worked less than 40 hours per week, that the hours worked were somewhat irregular, that she did stop coming to work after February 24, and that she did not return several calls of inquiry from ARC regarding her intent to return. Significantly, the attorney's letter emphasized that they wanted to hire her after the 520-hour penalty period ended, but because of her irregular hours it was not certain when that time period would expire. She left before

they had that calculation. In short, the record verifies the facts set out in a letter that is mislabeled schizophrenic.

The second piece of circumstantial evidence to which Venturelli points is Baldwin's telephone conversation with ARC's insurance carrier, made in Venturelli's presence, where Baldwin relayed incorrect information that Venturelli would not be eligible for health benefits were ARC to hire her immediately. Venturelli argues that the record would allow a jury (1) to conclude that Baldwin was lying, as opposed to relying honestly on what the insurance company told her, and (2) to infer that "the lie could only have been intended to discourage Venturelli from pursuing employment at ARC during her pregnancy."

For such a statement to be sufficient circumstantial evidence under the direct method, the remark in question must be "directly related to the employment decision." *Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001). Venturelli, however, adduces no evidence that Baldwin's alleged lie about the insurance was in any way related to ARC's decision not to hire her as of January or February 2000. The only record evidence concerning the incorrect information that pregnancy was an uninsured preexisting condition is Kinsey's testimony that including Venturelli on ARC's insurance coverage would have no effect "because our health insurance costs us the same whether someone is pregnant or not pregnant." And as discussed earlier, Venturelli was already receiving insurance benefits from her husband's employer, and she intended to stay with that insurance until after the baby was born. *See* fn.2 *supra*. We thus conclude that this piece of evidence does not entitle Venturelli to reach a jury under the direct method. Because Venturelli puts forth no further evidence under the direct method, we turn to her evidence in relation to the indirect method.

**B. Indirect Method**

Under the indirect method of proof, a plaintiff must first establish a prima facie case of discrimination. To make a prima facie case, Venturelli must show that: (1) she was pregnant; (2) she applied and was qualified for the position sought; (3) she was rejected; and (4) the position remained open and ARC continued to seek applicants from persons of Venturelli's qualifications. *Heerdink v. Amoco Oil Co.*, 919 F.2d 1256, 1259 (7th Cir. 1990). An alternate means of proving prong four is to establish that someone who was not pregnant received more favorable treatment. *Mills v. Health Care Servs. Corp.*, 171 F.3d 450, 454 (7th Cir. 1999) (citing *E.E.O.C. v. Our Lady of Resurrection Med. Center*, 77 F.3d 145, 148 (7th Cir. 1996)). If Venturelli were to establish a prima facie case, to avoid liability ARC would then have to come forward with a non-invidious reason for its decision. *Rogers*, 320 F.3d at 755. If ARC were to meet its burden of production, to avoid summary judgment Venturelli would then have the burden to present competent evidence that the proffered non-discriminatory explanation is pretextual.

No dispute exists regarding the first two elements of the prima facie case. The third element is not so clear. The district court held, and ARC argues, that Venturelli does not meet prong three because ARC did, in fact, offer her the job. A review of the record underscores how the parties were not connecting in their communications with each other. Clearly ARC wanted to hire Venturelli as the administrative assistant. However, Collins' ramblings about motherhood apparently reduced or even eliminated Venturelli's desire to accept a permanent job at ARC. Unfortunately she said nothing to Collins, Baldwin or Kinsey about her concern of a perceived negative attitude toward pregnant employees at ARC (an organization whose mission included helping

pregnant women). Further clouding the picture was the projected expiration of the 520-hour penalty period that would enable ARC to hire Venturelli. But when Venturelli met with Collins and later Baldwin, the date of the expiration of that time period had not yet been determined. As was later calculated, that expiration date was February 14, ten days before Venturelli's chosen departure date of February 24. So while there apparently was an offer made by ARC for Venturelli to be administrative assistant after the time off she needed after she had her baby, there is no indication in light of the evidence favorable to Venturelli of an offer to hire her during that ten-day period before she voluntarily left the temporary assignment at ARC.

But that gap does not nail down the third element for Venturelli—that she was not hired because she was pregnant. Not only did she remain silent when, at two separate meetings, Collins made what she concluded were offensive comments; she said nothing about her concerns at her subsequent meeting with Baldwin, an undisputed employment decisionmaker, when the hiring discussion digressed into whether pregnancy was a preexisting condition under ARC's benefits package. Nor did she return Kinsey's call (to discuss the administrative assistant position), a clear opportunity to raise her concern with ARC's executive director. Their response would have presented evidence of whether they would or would not have hired her (or even if she wanted to be hired) during that ten-day period while she was pregnant. All that remains is Venturelli's conjecture of what Collins meant when he expressed concern about whether and when Venturelli would return to ARC after she had the baby. That is not enough.

Venturelli's claim falls short under the fourth element as well. For the fourth element of the prima facie case, we determine whether the position remained open and ARC

continued to seek applicants from persons of Venturelli's qualifications. In her opening brief, Venturelli contends that she meets prong four because ARC "continued to seek applicants for the position." The undisputed evidence, however, is to the contrary. In December 1999, with the decision to offer the administrative assistant position to Venturelli, ARC canceled all advertising for that vacancy. Even after its final communications with Venturelli in February 2000, when any rejection would have had to have been made, ARC continued for several months to staff the position of permanent administrative assistant with temporary employees in anticipation that Venturelli would eventually fill the position. There is no evidence in the record that ARC continued seeking applicants. It was only after June 2000, after several attempts to contact Venturelli and months of not hearing back from her, that ARC sought new applications for the position of administrative assistant. Thus, even if ARC had, in fact, rejected Venturelli for the position in January or February 2000, there is not a shred of evidence that it then *continued* to seek applicants for the permanent post of administrative assistant from people of Venturelli's qualifications.

Venturelli also argues that she can satisfy prong four by showing that ARC treated someone who was not pregnant more favorably, pointing specifically to ARC's process for hiring Laura Schleif beginning in August 2000, roughly five months after Venturelli had ceased job-related contacts with ARC. This argument fails because Venturelli points to no evidence that would allow a jury to conclude that ARC treated Schleif any more favorably than it treated Venturelli. Like Venturelli, Schleif was pregnant and a temporary employee when ARC decided to hire her as an administrative assistant. As it had advised Venturelli, ARC told Schleif that she could begin the job after she had her baby. The only difference between Schleif and Venturelli is that Schleif was

apparently hired before she completed the 520-hour requirement. Had Venturelli, like Schleif, chosen to accept the full-time position after delivering her baby, she too could have returned to ARC as soon thereafter as she desired. In other words, Venturelli and Schleif were, in all relevant aspects, treated the same: ARC would have allowed either to begin working in the permanent administrative assistant position after she had delivered her baby. In no sense can ARC be said to have treated Schleif any more favorably than it had treated Venturelli.

We hold that, because Venturelli cannot establish the third or fourth elements of the prima facie case, she is not entitled to reach a jury via the indirect method of proving a Title VII violation.

## III.

From start to finish this is an unfortunate sequence of events. ARC wanted to hire Venturelli as administrative assistant and at some point she wanted the job. But communications broke down when Collins callously muddled a job offer by referring to his perceptions of mothers and their new babies. Although Venturelli was offended, she said nothing to Collins, nor did she discuss her concerns with Kinsey or Baldwin. She left the temporary job as scheduled and never returned calls about the job. Venturelli does not present direct or circumstantial evidence sufficient to proceed under the direct method of proving discrimination. Also, she is unable to produce evidence under the indirect method for establishing the third or fourth elements of a prima facie case. We therefore AFFIRM the district court.

EVANS, *Circuit Judge*, dissenting.   When originally dissenting to the opinion we have now vacated, *Venturelli v. ARC Community Services, Inc.*, 336 F.3d 606, 618 (7th Cir. 2003), I noted that this case was much closer to *Maldonado v. U.S. Bank*, 186 F.3d 759 (7th Cir. 1999), than *Troupe v. May Department Stores Co.*, 20 F.3d 734 (7th Cir. 1994). In the majority's new opinion, *Maldonado* is not mentioned, and a question left unanswered the first time around—whether Mr. Collins was "a decisionmaker"—is answered against Ms. Venturelli, as the court now concludes as a matter of law that he was not. That conclusion, given that ARC was a small operation and Collins was its comptroller, is questionable. But the conclusion certainly does one thing— it excuses the majority from laying Collins' stereotyping remarks on ARC's doorstep. I think the facts—including whether Collins was a decisionmaker—are sufficiently in dispute so as to preclude summary judgment. I would let a jury decide this case, and so I continue to dissent.

A true Copy:

       Teste:

                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*