In the

# United States Court of Appeals

### For the Seventh Circuit

No. 01-2876

KERRY STINNETT,

*Plaintiff-Appellant,*

*v.*

IRON WORKS GYM/EXECUTIVE HEALTH SPA, INCORPORATED,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 98 C 50171—**Philip G. Reinhard,** *Judge.*

ARGUED FEBRUARY 22, 2002—DECIDED AUGUST 26, 2002

Before POSNER, KANNE and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* The law allowing victims of
sexual harassment to sue their employers applies only to
those businesses with fifteen or more employees for each
working day in each of twenty or more calendar weeks
in the current or preceding calendar year. *See* 42 U.S.C.
§ 2000e(b). In order to proceed in his sexual harassment
claim, Kerry Stinnett was thus required to show that his
employer, Iron Works Gym/Executive Health Spa, Incor-
porated (collectively "Executive Health"), employed at least
fifteen persons during 1995, 1996 or 1997. This proved to
be an insurmountable task for Stinnett, however, because

the Executive Health Spa was a house of prostitution and criminal enterprises rarely keep accurate personnel or payroll records. The district court granted summary judgment in favor of the employer because Stinnett had inadequate evidence to show the number of employees at Executive Health at the relevant time. We affirm.

## I.

We construe the facts in a light most favorable to Stinnett, the party opposing summary judgment. *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001). Kerry Stinnett was employed as the manager of the Iron Works Gym (the "Gym") from June 1996 through July 1997. The Gym employed nine persons including Stinnett. The Gym, which was a sole proprietorship, was wholly owned by the Executive Health Spa (the "Spa"), another business down the street from the Gym. The Spa was incorporated and its sole shareholder was Stinnett's boss, Kathy Andrews. For reasons we will discuss below, the district court counted the Gym and Spa as a single entity when determining the number of employees. The Gym, so far as the record shows, was actually a gym. The Spa, however, was a house of prostitution providing sexual services to its patrons under the guise of "massage." Not surprisingly, the Spa's payroll records are somewhat sketchy and show that the Spa never employed enough workers to meet the minimum requirement of fifteen, even if the Spa and Gym are counted together and even if the "spa attendants" (a creative euphemism for prostitutes) are counted as employees.

In order to meet the minimum requirements of section 2000e(b), Stinnett sought to demonstrate that Executive Health had fifteen or more employees for each working day in 20 or more calendar weeks in the current or preceding calendar year. For Stinnett's claim, this required him to show that Executive Health had fifteen or more employees

in 1995, 1996 or 1997. Posed with the rather difficult problem of proving the number of employees in a business that has much to hide, Stinnett offered the following evidence in support of his claim that the Spa, in combination with the Gym, employed fifteen or more persons: (1) the deposition of Carrie Lee, a former spa attendant; (2) the transcript of a 1999 conversation between Kathy Andrews and a prospective employee taped during an undercover criminal investigation of the Spa; (3) the affidavit of Kerry Stinnett himself; and (4) the defendants' answers to interrogatories, Local Rule 56.1 statement, and Andrews' affidavit. On the motion of Executive Health, the court struck the first three categories of evidence that Stinnett offered to demonstrate an adequate number of employees at Executive Health. The court struck the deposition of Lee because her personal knowledge of the workings of the Spa ended in 1993, substantially prior to the events alleged in the lawsuit. The court struck the transcript of the conversation taped during the criminal investigation because it referred only to the number of persons working at the Spa in 1999, significantly after the relevant time frame. Because Stinnett's later-written affidavit conflicted with his deposition testimony, the district court struck the paragraphs relating to the number of employees. After reviewing the remaining evidence, the court found that Stinnett had no admissible evidence in the record to support the claim that Executive Health employed the requisite number of workers, and the court therefore granted summary judgment in favor of Executive Health. Stinnett appeals.

## II.

We review the district court's grant of summary judgment *de novo*, construing all facts and drawing all inferences from the record in the light most favorable to the non-moving party. Fed. R. Civ. Pro. 56(c); *Smith*, 242 F.3d at

742. In granting summary judgment, the court may consider any evidence that would be admissible at trial. *Smith*, 242 F.3d at 741. The evidence need not be admissible in form (for example, affidavits are not normally admissible at trial), but it must be admissible in content. *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267-68 (7th Cir. 1994). Here, the district court struck the evidence not because of its form but because of its content. In order to determine whether the court properly granted summary judgment, we must first consider whether the court erred in granting Executive Health's motion to strike the evidence which Stinnett sought to use to prove the requisite number of employees. We review the district court's grant of a motion to strike for abuse of discretion. *Winfrey v. City of Chicago*, 259 F.3d 610, 618-19 (7th Cir. 2001). The parties agree that the relevant time period for determining whether Executive Health was an employer subject to the discrimination law was 1995, 1996 or 1997.

Executive Health does not contest the district court's conclusion that the Spa and the Gym should be treated as a single entity for the purposes of determining the number of employees. *See Papa v. Katy Indus., Inc.*, 166 F.3d 937, 940-41 (7th Cir. 1999), *cert. denied*, 528 U.S. 1019 (1999) (setting forth the factors for determining whether to count together the employees of affiliated corporations for the purposes of section 2000e); *Moriarty v. Svec*, 164 F.3d 323, 336 (7th Cir. 1998) (Manion, J., concurring) (noting that a sole proprietorship has no legal identity separate from the entity that owns it). The district court found that the Gym, as a sole proprietorship, had no legal identity separate from the Spa, a corporation which wholly owned the Gym. We will therefore analyze the evidence as if the Spa and the Gym are a single legal entity and will count their employees together in determining if the standard set by section 2000e is met.

We begin with the deposition of Carrie Lee, one of the spa attendants. Lee had considerable difficulty recalling the dates of her employment at the Spa in part because she quit once and was terminated twice. Ultimately, though, she testified that she last worked at the Spa in 1993. She stated that when she left the Spa for the final time in 1993, there were approximately 20 to 23 women working there. She stated that approximately 10 women worked each of two shifts and that another woman answered phones. Although she also stated that an equal number of women worked at the Spa in 1996 and 1997, she clarified that she had no personal knowledge of this fact and based it on the complaints of a friend who worked at the Spa at that time, and who was annoyed that she had to work with so many other women. Because Lee's personal knowledge ended in 1993, two years before the relevant time, the district court struck Lee's deposition (and presumably would have struck her testimony at trial) because her personal knowledge of the number of workers ended in 1993.

The district court similarly struck the transcript of an audiotape made during a criminal investigation of the Spa in 1999. A woman named Tammy Strawberry, cooperating with local authorities, wore a wire into a meeting with Kathy Andrews. The ostensible purpose of the meeting was that Strawberry was applying for a job as a spa attendant at the Executive Health Spa. In the course of the conversation, Andrews volunteered that "We have what, 25, 30 people that work here." R.40, Transcript at 15. The conversation took place on September 2, 1999, approximately a year and a half after Stinnett terminated his employment at the Gym. The district court struck the transcript because the conversation occurred in 1999 and was not relevant to how many employees worked at Executive Health during 1995, 1996 or 1997. Under the district court's ruling, both the Lee deposition and the Strawberry transcript described the number of employees at times that were too remote to

be relevant to the number of employees during 1995, 1996 and 1997.

Stinnett argues that if there were 20 employees before the relevant time and 20 employees after the relevant time, the court must infer that there were at least 15 employees during the relevant time. But we cannot find that the district court abused its discretion in striking these materials from the record on the ground that they were too remote in time to be relevant. The court was not obliged to stretch this far to infer the requisite number of employees. *See Horwitz v. Board of Educ. of Avoca School Dist. 37*, 260 F.3d 602, 619 (7th Cir. 2001) (protected speech occurring eighteen months before termination is too remote in time to raise inference that termination was related to speech); *Alverio v. Sam's Warehouse Club, Inc.*, 253 F.3d 933, 943 (7th Cir. 2001) (court need not infer that termination was retaliatory when allegedly triggering event occurred eighteen months prior to termination); *Robin v. Espo Engineering Co.*, 200 F.3d 1081, 1089 (7th Cir. 2000) (discriminatory comments made two years prior to termination too remote in time to give rise to inference that termination was due to discrimination). Perhaps if Stinnett produced evidence that the number of employees remained fairly constant over time, or if he possessed evidence regarding the number of employees closer in time to the relevant events, the court would have been obliged to find the before-and-after numbers relevant. But evidence of the number of employees two years before or eighteen months after the relevant time is too remote to give rise to an inference regarding the number of employees at the relevant time. This conclusion is bolstered by evidence demonstrating that many of the women working for the Spa, including Carrie Lee, had volatile employment histories marked by frequent departures. The number and identity of workers appears to have been in flux throughout the relevant time period. In those circumstances, we find

the district court did not abuse its discretion in striking Lee's deposition and the Strawberry transcript.

The court also struck paragraphs nine and eleven of Stinnett's affidavit because they lacked foundation and because they conflicted with his deposition testimony. The district court has great discretion in deciding whether to allow a party to change damaging deposition testimony with a supplemental affidavit. *Maldonado v. U.S. Bank*, 186 F.3d 759, 769 (7th Cir. 1999). "Courts generally ignore attempts to patch-up potentially damaging deposition testimony with a supplemental affidavit unless the party offers a suitable explanation—e.g., confusion, mistake or lapse in memory— for the discrepancy." *Id*. The stricken paragraphs describe, among other things, the number of spa attendants working each of three shifts at the Spa, with a total number of 20 to 25 women plus an additional staff of five other employees. The court noted first that Stinnett had no personal knowledge of the number of workers at the Spa before he came to work at the Gym in July 1996. Between July 1996 and July 1997, when Stinnett was working at the Gym, he visited the Spa only once a week to deliver the receipts from the Gym. He occasionally performed an odd job at the Spa but spent very little time there by his own admission. In part because he had no basis for his knowledge of the number of employees, the court struck these paragraphs from the affidavit.

Stinnett initially testified in his deposition that Andrews employed 25 to 30 women at the Spa. Stinnett Dep. at 152. When cross-examined on whether these women were full-time or part-time employees, Stinnett replied, "I don't know how those girls worked." Stinnett Dep. at 162. He clarified, "All I know is that somebody I knew worked there. If Kathy [Andrews] paid them or if the men paid them, who paid them, I don't know." Stinnett Dep. at 162. He testified that he did not spend much time at the Spa because Andrews did not want him there. Stinnett Dep. at 163. He testified that Andrews controlled the way the spa attendants

worked, but admitted he was relying not on what he personally heard or observed but rather on what he was told. Stinnett Dep. at 163-64. When asked again to clarify how the spa attendants were paid, he stated, "They were paid by the men that came in there for the service." Stinnett Dep. at 164. But he also testified that Andrews paid them as well, and that the spa attendants paid Andrews rent for using rooms at her facility to conduct their business. Stinnett Dep. at 164-66. Stinnett was unable to explain why Andrews was paying women who were paying her to rent rooms. Ultimately, he concluded, "How she runs her little business, that's her business. It has made her a wealthy woman." Stinnett Dep. at 166.

More than a year after giving this erratic testimony, in the face of a motion for summary judgment, Stinnett's confusion apparently cleared up. He stated definitively in his affidavit the number of women working each shift, that they were paid cash by Andrews, and that the minimum number of employees at the Spa never dropped below fifteen during the time he was working for the Gym. Having previously testified that he had no idea how the women were paid, in his affidavit Stinnett stated that he knew that Andrews paid them cash because she told him she did. Stinnett has never explained the discrepancies between his deposition testimony and his affidavit. The district court did not err in striking those portions of Stinnett's affidavit that conflicted with his prior deposition testimony. *See Cowan v. Prudential Ins. Co. of America*, 141 F.3d 751, 756 (7th Cir. 1998) (parties may not defeat summary judgment by creating sham issues of fact with affidavits that contradict their prior depositions); *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1168-70 (7th Cir. 1996) (same); *Adelman-Tremblay v. Jewel Companies, Inc.*, 859 F.2d 517, 520 (7th Cir. 1988) (same). Any references to the number of employees or how they were paid were properly excluded because Stinnett gave conflicting evi-

dence and then claimed ignorance of the inner workings of the Spa at his deposition.

The remaining evidence regarding the number of employees at Executive Health during the relevant time demonstrates that there were fewer than fifteen employees. Stinnett cites the defendants' Local Rule 56.1 statement, Kathy Andrews' affidavit and the defendants' answers to interrogatories as evidence supporting his claim that there were fifteen employees. He maintains that if the spa attendants are counted as employees rather than independent contractors, Executive Health had well in excess of fifteen employees. Executive Health, of course, maintains that the spa attendants were independent contractors, but argues in the alternative that even if they are counted as employees, they do not raise the total number of employees to fifteen for the relevant time period. Executive Health is the subject of a criminal investigation and it is not surprising that it seeks to distance itself from the spa attendants, as any criminal enterprise would seek to distance itself from the front lines of criminal activity. This quandary over the proper status of the spa attendants turns out to be a red herring, though. We have carefully reviewed all of the evidence on which Stinnett relies and none of it shows that there were more than fourteen employees for each working day in each of twenty or more calendar weeks in the relevant calendar years, even if spa attendants are counted as employees rather than independent contractors.

That brings us finally to the ultimate question of whether the district court properly granted summary judgment in favor of Executive Health. Without any admissible evidence showing the requisite number of employees, Stinnett cannot maintain his sexual harassment claim. The court was therefore correct to grant judgment in favor of the employer.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*