In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 17-2890

RAY K. HAYNES,

*Plaintiff-Appellant,*

*v.*

INDIANA UNIVERSITY, *et al.,*

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:15-cv-01717-LJM — **Larry J. McKinney**, *Judge.*

_____

ARGUED APRIL 11, 2018 — DECIDED SEPTEMBER 4, 2018

_____

Before BAUER, SYKES, and BARRETT, *Circuit Judges.*

SYKES, *Circuit Judge.* Ray Haynes was employed as an assistant professor in the Department of Education at Indiana University. At the end of his six-year probationary contract, he lost his bid for tenure. Haynes, who is black, alleges that the University denied his tenure application because of his race in violation of federal law. The district judge entered summary judgment for the University and we affirm. The judge's evidentiary rulings were sound, and the record does

not support an inference that the University denied tenure because of Haynes's race.

## I. Background

In 2008 Indiana University hired Haynes as an assistant professor in the Instruction Systems Technology Department of the School of Education. Roughly three-quarters of Haynes's salary was financed by the Strategic Recruitment Fund, which the University established to "facilitate the recruitment of underrepresented minorities and women into the professoriate." Haynes was offered a six-year probationary contract, at the end of which the University would decide if he qualified for tenure.

Achieving tenure at Indiana University is a multistep process fraught with nuanced and highly contextualized value judgments. The University's tenure guidelines provide that "[d]ecisions about tenure … are reached through the comprehensive and rigorous peer review of achievements and promise." More specifically, a candidate is evaluated across three dimensions: research, teaching, and service. He must be "excellent" in at least one area of his choosing and "satisfactory" in the other two.

After making this selection, the candidate formally begins the tenure application process. He first assembles a dossier that includes his curriculum vitae, a personal statement, and a list of twelve proposed external reviewers. The candidate and the University together select six of these reviewers to write letters evaluating the candidate's application. Once completed, these letters are submitted with the rest of the dossier for several levels of faculty review. First, a committee within the candidate's department considers the

application and issues a recommendation. Its findings and conclusions are then passed along to a school-wide committee, which does the same. Finally, with the candidate's dossier and two committee reports in hand, the University's Tenure Advisory Committee makes a recommendation to the Vice Provost, who in turn issues a tenure decision and submits it for final approval by the Provost, President, and Board of Trustees.

This case centers on Haynes's experience with this winding tenure process. In April 2013 Haynes submitted his dossier to the School of Education, which was responsible for reaching out to his proposed external reviewers. Surprisingly, only one of Haynes's twelve potential recommenders agreed to evaluate his application. This left Haynes to seek out alternates. Thomas Brush, the chair of his department, offered a few suggestions, and Haynes put forward a few more of his own. Together Brush and Haynes eventually secured six reviewers willing to write evaluations, three proposed by Haynes and three he adopted on Brush's recommendation.

The letters were largely positive, albeit with a notable exception. Patricia Hardré, one of Brush's proposed reviewers, put Haynes's "overall research performance in a gr[ay] area of clearly satisfactory[] but not clearly excellent." Her main concern was that Haynes's research was "not as rigorous in methods, nor as high-quality in venues, as most candidates" she had reviewed from peer institutions. Hardré also opined that Haynes offered nothing "new" beyond his "unique specialization of 'inclusion' and his identity as an African-American." She again commented on Haynes's race later in her evaluation, this time saying she regretted that she was

unable to "support and endorse a colleague who is a member of an underrepresented minority."

These critiques notwithstanding, Haynes took his completed dossier and embarked on the University's tiered review process. Because he selected research as his performance area of excellence, he needed to demonstrate that he was "beginning to establish a national and/or international reputation as an original contributor through research." Haynes also had to prove that his teaching and service to the University community were satisfactory.

Haynes got off to a good start with his department's tenure committee, which voted 4–2 in his favor. Brush supported the committee's recommendation and drafted a summary of its findings to be included with Haynes's dossier. He remarked that Haynes's scholarship could "have a huge impact in K–12, higher education, and business and industry settings." Despite Hardré's concerns, he also noted that several of "Haynes'[s] peer-reviewed publications [are] in well-respected journals." Finally, Brush compiled a series of student reviews that favorably commented on Haynes's teaching performance.

Haynes's dossier was then forwarded to Krista Glazewski who presented his case to the School of Education's tenure committee. There Haynes did not fare as well as he might have hoped. The committee voted 6–3 against tenure, finding Haynes's research to be less than excellent and his teaching to be unsatisfactory. Gerardo Gonzalez, the school's dean, wrote a memorandum adopting and expressing the committee's concerns. In it he explained that "the committee questioned the extent of Dr. Haynes'[s] impact based on low citation numbers and low numbers of publica-

tions in high-quality journals." As for teaching, the com-
mittee noted that Haynes's "evaluations ha[d] been mixed[]
and particularly low in the online courses." Gonzalez con-
tinued: Haynes failed to show "significant improvement
over the years[,] and comments from some students indicat-
ed that Dr. Haynes sometimes [was] unresponsive to emails
and questions about course assignments." In December 2013
Gonzalez advised Haynes that the School of Education
would recommend against tenure.

Things only got worse for Haynes at the university-wide
Tenure Advisory Committee. For many of the reasons cited
by the School of Education, the committee voted unanimous-
ly against tenure in a 9–0 vote. All nine members concluded
that Haynes's research was not excellent, and eight deter-
mined that his teaching was unsatisfactory. The University's
Vice Provost adopted these conclusions and informed
Haynes on March 26, 2014, that tenure was denied. All in all,
27 faculty members voted on Haynes's application, with 18
finding his teaching unsatisfactory and 19 concluding that
his research was not excellent.

Haynes vigorously contested his tenure decision. He be-
gan with several layers of academic review, then lodged a
complaint with the Equal Employment Opportunity Com-
mission, and finally filed suit in federal court against the
University and several of its administrators in their individ-
ual and official capacities. (We refer to the defendants collec-
tively as "the University" unless the context requires
otherwise.) Haynes alleged that his application for tenure
was rejected because of his race in violation of the Civil
Rights Act of 1866, 42 U.S.C. § 1981, and Title VII of the Civil
Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. Haynes sought

several forms of injunctive relief, including reinstatement, and monetary damages for lost pay and other injuries.

The case proceeded through discovery, and the University eventually moved for summary judgment. Several issues in this appeal involve the ensuing motions filed in the district court, which requires us to dive into a bit of procedural minutiae.

Haynes submitted a declaration from Laura Perna, his expert on academic tenure, with his response to the University's motion. The University moved to strike the declaration, both in its reply brief and by adjoining motion, arguing that the expert's opinion did not meet the requirements of Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Haynes asked for leave to file a surreply on the admissibility of his expert's declaration. He also sought to submit a lengthier report from Perna and an additional expert report from Anthony Greenwald on the subject of implicit bias. Haynes argued that these additional materials were relevant to the *Daubert* determination. He filed a separate motion for leave to supplement the record with these reports because he was presenting them after summary-judgment briefing had concluded. He said the reports were late because Perna and Greenwald couldn't prepare them in time to comply with the court's briefing schedule.

The judge excluded Perna's expert declaration and declined to accept the additional expert reports. Applying Rule 702 and *Daubert*, the judge concluded that the opinions in Perna's declaration were inadmissible because she did not rely on any specialized knowledge and her testimony would

not assist the trier of fact. As for the late expert reports, the judge rejected the explanation for their tardiness because Haynes had never before suggested that the court's briefing schedule for dispositive motions might interfere with the preparation of any expert reports. In fact, he had sought and obtained several extensions of time without raising this concern.

With these evidentiary disputes out of the way, the judge turned to the motion for summary judgment and ruled that Haynes's claims failed as a matter of law. The judge identified a number of flaws in Haynes's case, but the primary basis for the decision was the lack of record support for Haynes's claim that the University denied his tenure application because of his race.

## II. Discussion

Haynes asks us to review the summary judgment and the evidentiary rulings that preceded it. We review a summary judgment de novo, *Manley v. Law*, 889 F.3d 885, 889 (7th Cir. 2018), and we set aside the district court's evidentiary rulings only for an abuse of discretion, *see Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704–05 (7th Cir. 2009) (expert testimony); *Stinnett v. Iron Works Gym/Exec. Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002) (motions to strike); *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011) (motions to supplement).

We think the judge made the right call on all fronts. Before we turn to these rulings, however, we pause to determine which of Haynes's claims are properly before us. The University argues that the Title VII claim fails on procedural

grounds and that part of the § 1981 claim is barred by sovereign immunity.

## A. Title VII Claim

A Title VII plaintiff must first file a complaint with the Equal Employment Opportunity Commission within 300 days of "when the defendant has taken the action that injures the plaintiff." *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001). Haynes's complaint was untimely under this rule. The Vice Provost notified Haynes on March 26, 2014, of the University's decision to deny tenure, so the deadline to lodge a complaint with the EEOC was January 20, 2015. He waited until April 10, 2015, to file his EEOC complaint.

Haynes asks us to apply equitable tolling to forgive the late complaint. We can do so only if a reasonable person in his position would not have been "aware of the possibility of a claim of discrimination" at the time of the adverse employment action—here the tenure decision. *Hentosh v. Herman M. Finch Univ. of Health Scis./The Chi. Med. Sch.*, 167 F.3d 1170, 1175 (7th Cir. 1999) (internal quotation marks omitted). Even if this standard is satisfied, we will not grant "an automatic extension of indefinite duration." *Id.* The plaintiff is not entitled to a renewed 300-day window even when tolling is justified. *See Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 268 (7th Cir. 1995). Instead, tolling is appropriate only for a length of time within which it would have been reasonable to file a complaint. *See Hentosh*, 167 F.3d at 1175.

Even if we assume tolling is justified here (and we're skeptical), Haynes waited far too long. He alleged in his complaint that "on or around October 24, 2014, was the first

time that [he] suspected or was aware of racial discrimination against him." Absent amendment, that amounts to a binding judicial admission, and it cannot be controverted on appeal. *See Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995). Haynes therefore knew he had a possible discrimination claim on that date at the latest. This leaves us to ask whether three months—from October 24, 2014, to the original deadline—was enough time for Haynes to file an EEOC complaint. It clearly was. We have remarked that administrative complaints should be filed "within days, and at most weeks," of discovering a possible discrimination claim. *Thelen*, 64 F.3d at 268. Haynes makes no effort to explain why he needed more time. The Title VII claim fails for lack of a timely EEOC complaint.

## B. § 1981 Claim

With no Title VII claim left, Haynes's suit rests entirely on § 1981. This venerable civil-rights statute gives "[a]ll persons within the jurisdiction of the United States" the same right "to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Haynes sued the University, its Board of Trustees, and several of its administrators in their individual and official capacities seeking various forms of injunctive relief and damages for violating his rights under this provision.

Everyone agrees that the claim for injunctive relief can proceed against the official-capacity defendants. The University argues that sovereign immunity completely bars Haynes's action for monetary damages. This is clearly correct with respect to the University and the Board of Trustees. A state and its agencies cannot be subject to a federal suit without the state's consent, *N. Ins. Co. of N.Y. v.*

*Chatham County*, 547 U.S. 189, 193 (2006), and this bar applies with full force to claims under § 1981, *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1184 (7th Cir. 1982). The University and its Board of Trustees are state agencies for sovereign-immunity purposes, so Haynes cannot maintain an action for damages against them. *Peirick v. Ind. Univ.–Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 695 (7th Cir. 2007).

Haynes cannot pursue a damages action against the University administrators either. A plaintiff cannot bring a claim for damages against state personnel in their official capacities. *See Nelson v. Miller*, 570 F.3d 868, 883 (7th Cir. 2009). Neither can he seek monetary relief from state employees in their *individual* capacities *if* the suit "demonstrably has the identical effect as a suit against the state." *Luder v. Endicott*, 253 F.3d 1020, 1023 (7th Cir. 2001) (emphasis omitted). That is to say, sovereign immunity bars individual-capacity claims for damages whenever "[t]he money will flow from the state treasury to the plaintiff[]." *Id.* at 1024.

Applying this rule can be a knotty and fact-bound inquiry, but clear precedent guides us here. In *Omosegbon v. Wells*, 335 F.3d 668 (7th Cir. 2003), a junior professor brought an action for damages and injunctive relief against a number of her supervisors in their individual capacities after she was fired by Indiana State University. We held that sovereign immunity barred her claim for damages for alleged federal constitutional violations. We found it "inescapable that any resulting judgment will be paid by the state" because the professor sought "backpay and other forms of monetary compensation based on an employment contract." *Id.* at 673. We also noted that the individual defendants "were not even parties to the contract in their individual capacity." *Id.*

This case is materially the same. Most importantly, Haynes seeks monetary relief for an injury relating to his employment with Indiana University. As in *Omosegbon*, the University administrators were not parties to Haynes's employment contract in their individual capacities. We have no reason to believe that they, rather than the University, would foot the bill for a resulting judgment. Sovereign immunity therefore defeats Haynes's damages action against the University administrators, both in their individual and official capacities. That leaves us with one claim for review: a § 1981 action for various forms of injunctive relief.

## C. Evidentiary Rulings

We have one more issue to resolve before turning to the merits. Haynes argues that the judge incorrectly excluded his three proffered expert reports: the Perna declaration, the Perna report, and the Greenwald report.

Perna's initial declaration offered two opinions: the University granted tenure to an equally qualified white woman the year before it denied Haynes's application, and "various aspects of [Haynes's] promotion and tenure process were not appropriately executed." The judge properly excluded this proposed testimony. Rule 702 permits a qualified expert to testify to "specialized knowledge" if it "will help the trier of fact to understand the evidence or to determine a fact in issue." The Perna declaration fell short on both grounds.

First, Perna lacked the specialized knowledge necessary for an opinion on the relative merits of Haynes's tenure application as compared to anyone else's. Perna specifically acknowledged that she had no "expert[ise] in … Haynes'[s]

content area." In other words, she disclaimed the only specialized knowledge that would qualify her to offer an opinion on Haynes's fitness for tenure. Her analysis betrayed as much. Perna drew her sweeping conclusion from the simple fact that Haynes and the proposed white female comparator had similar publication rates. This runs contrary to the University's stated tenure guidelines, which stress that a candidate's research acumen "cannot be fully captured by the count of publications." It also doesn't help the trier of fact; a layperson can easily tally up the number of articles published.

Similarly, the other opinion proffered in Perna's initial declaration—that "various aspects" of Haynes's tenure process were poorly executed—did not rest on any specialized knowledge. Rather than chronicle the University's procedure and then compare it to what she believes is the academic norm, Perna focused myopically on Haynes's external reviewers, and even then her "analysis" is little more than a series of quotations from the record. She pointed to certain University personnel who expressed concern with the "probative value" of Haynes's external recommenders, only to respond with a quote from his mentor who admitted she "dropped the ball on external reviewers." This implies at most that some at the University recognized a problem with one or more of Haynes's external reviewers. At no point did Perna bring her own specialized knowledge to bear and explain the significance of these statements. In effect, Perna's declaration merely flags certain record evidence for the fact-finder's consideration. That doesn't assist the fact-finder in understanding the evidence.

The judge also appropriately excluded Perna's and Greenwald's formal expert reports. Haynes points to nothing in Perna's more complete report that remedies the admissibility concerns with her initial declaration, so we'll assume that's because there's nothing to find. Greenwald's report addresses the possibility of *implicit* racial bias, but unintentional discrimination is not cognizable under § 1981. *See, e.g.*, *Melendez v. Ill. Bell Tel. Co.*, 79 F.3d 661, 669 (7th Cir. 1996) ("To prevail under 42 U.S.C. § 1981, a plaintiff ultimately must prove that he has been a victim of intentional discrimination.").

Finally, even if the Perna and Greenwald reports were otherwise admissible, the judge did not abuse his discretion in declining to allow Haynes to add them to the record after summary-judgment briefing had ended. The judge was motivated by an entirely reasonable concern: he did not want Haynes to introduce new evidence without letting the University respond. And as we've noted, Haynes never alerted the judge to any problems his experts had in meeting the dispositive-motions deadline until after briefing was complete. Indeed, he earlier sought four extensions of time, requested further discovery under Rule 56(d) of the Federal Rules of Civil Procedure, *and* moved to enlarge time for expert discovery without once suggesting that the expert reports wouldn't be ready in time for a summary-judgment motion.

Haynes nonetheless asks us to excuse his failure to raise the issue earlier. He claims it would have been futile to request more time because the magistrate judge's scheduling order instructed the parties "not [to] expect to receive extensions of their deadlines … that would threaten the ability to

have the [summary-judgment] motion … fully briefed by May 26, 2017." We don't read this as absolutely foreclosing any extension requests. More importantly, it's not an excuse for belatedly asking to supplement the record with expert reports after summary-judgment briefing is complete.

## D. Merits

At last we arrive at the merits. There are several ways to present a claim of racial discrimination, but we have recently explained that the inquiry can be distilled into a single rule: The plaintiff's case may proceed to trial only if "the evidence would permit a reasonable factfinder to conclude that the plaintiff's race … caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

This burden is especially difficult to meet when it comes to academic tenure. We have long recognized the "nuanced nature" of tenure decisions and our corresponding reticence to "second-guess the expert decisions of faculty committees." *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 815 (7th Cir. 2007) (quotation marks omitted). Scholars, not courts, "are in the best position to make the highly subjective judgments related with the review of scholarship and university service." *Farrell v. Butler Univ.*, 421 F.3d 609, 616 (7th Cir. 2005). Accordingly, we closely scrutinize discrimination claims in this context to be sure the dispute is not simply one of academic disagreement with the underlying decision to deny tenure.

The structure of the tenure process stands as an additional obstacle to a successful claim. Because a plaintiff must demonstrate that his race precipitated an "adverse employ-

ment *action*," *Ortiz*, 834 F.3d at 765 (emphasis added), our inquiry centers on the motivations of the ultimate decision-makers. With tenure this analysis is unusually complex. Several "independent and University-wide committees" conduct "numerous layers of review," and "the causal connection between any possible discriminatory motive of a subordinate participant … and the ultimate tenure decision is weak or nonexistent." *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 667 (7th Cir. 2007) (quotation marks omitted). Thus a plaintiff needs compelling evidence that "clear discrimination" pervasively infected the final tenure decision. *Farrell*, 421 F.3d at 609.

This case is not a close one under these standards. In fact, we need not rely much on the finer points of academic tenure and its intersection with antidiscrimination law. Haynes's claim fails for the simple reason that he lacks any evidence to suggest that the University denied tenure because he is black.

The bulk of Haynes's case focuses on his allegations of chicanery during the University's review of his tenure application. For example, he contends that Brush, the department chair, recommended critical and unqualified external reviewers, wrote the report of his committee's findings in a way that would make support for his candidacy look more tepid, and expressed animosity toward him both in person and in correspondence with other faculty members. He also alleges that Glazewski and Gonzalez, who took the lead when the process moved to the School of Education, engaged in similar behavior. Even if we credit these assertions, there remains a simple and fatal flaw. Haynes has *no* evidence that any of these people sought to

sabotage him because of his race. He must base the core of his claim on something other than bald speculation. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (holding that the employee bears the burden to prove that "discrimination was the *real* reason" behind an adverse action) (emphasis added).

Haynes next urges us to consider certain indicia of his performance as an assistant professor: he once obtained a research grant, won a teaching award, and earned an "exemplary" performance review several months before tenure was denied. To Haynes's mind these accolades show that the University *must* have acted out of racial animus because he was otherwise qualified for tenure. This argument is twice unsound. Again Haynes assumes racism with no proof. And as important, Haynes's argument rests on a premise we cannot entertain. To prove pretext he must first prove that he was worthy of tenure. But as we've just explained, we do not sit as an academic review board and "second-guess the expert decisions of faculty committees." *Sun*, 473 F.3d at 815. Haynes must do more than ask us to question the academic judgment of the 19 faculty members who decided he was unqualified for tenure.

Haynes's remaining evidence likewise fails to establish that racial bias motived the University's tenure decision. He cites the fact that the School of Education has never offered tenure to a black man. That's beside the point. A § 1981 claim "reaches only intentional discrimination" against the particular plaintiff, *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 396 (1982), and the University's track record says nothing about how it treated Haynes. Next, Haynes was hired through a minority-recruitment initiative,

which he says is evidence that the University needed to address a pervasive bias problem. That can't possibly be right. If anything it shows that the University sought to recruit and retain minority scholars, not turn them away.

Finally, Haynes argues that Hardré's letter evinced unmistakable racial bias that tainted the University's entire review. We disagree on both scores. Hardré cited Haynes's race as a factor in his favor; she lamented the fact that she could not "support and endorse a colleague who is a member of an underrepresented minority." But even if this comment were somehow problematic, there is little evidence that it poisoned the final tenure decision. Gonzalez mentioned the letter in his summary of the School of Education's findings, but Brush explained why its conclusions were unwarranted when he offered the departmental review. All of the scholars who had a role in this decision could weigh the letter as they saw fit.

In sum, the sole claim preserved in this case fails for lack of evidentiary support. Haynes cannot proceed to trial on a claim of racial discrimination without any evidence that the University discriminated against him because of his race.

AFFIRMED.