In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 19-1781

GREGORY L. BARNES,

*Plaintiff-Appellant,*

*v.*

BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS and MARK
DONOVAN,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division
No. 1:16-cv-08278 — **Virginia M. Kendall**, *Judge.*

_____

ARGUED DECEMBER 17, 2019 — DECIDED JANUARY 3, 2020

_____

Before RIPPLE, SYKES, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Gregory Barnes, who is African
American, sued the Board of Trustees of the University of Il-
linois and Mark Donovan, a former university administrator,
for racial discrimination under Title VII of the Civil Rights Act
of 1964 and 42 U.S.C. § 1983 after Donovan promoted a white
applicant instead of Barnes. Barnes contests the district
court's entry of summary judgment in favor of the

defendants. Because Barnes did not present evidence that Donovan's stated reason for selecting this applicant was a pretext for discrimination, we affirm.

Barnes works as an engineer in the facilities management department at the University of Illinois Chicago ("UIC"). UIC is divided into a west campus, which contains the hospital and medical buildings, and an east campus, which consists of other university buildings. UIC employs three chief engineers who manage the east campus, the west campus, and utilities, respectively, and who supervise the multiple assistant chief engineers on each campus. The three chief engineers report to the Vice Chancellor for Administrative Services who, at all relevant times, was Mark Donovan. UIC hired Barnes in 2008 as a plant operating engineer and later promoted him to assistant chief engineer on the east campus.

The operating engineer positions at UIC are classified as civil-service jobs under the State University Civil Service System ("SUCSS"). SUCSS classifies civil-service jobs and sets the minimum qualifications required for a position based on its classification. To be considered for a chief engineer position, applicants must take a civil-service exam and complete an application describing their education, work experience, and job responsibilities. Applicants who meet the minimum qualifications are placed on the civil-service register and, when a chief engineer position opens up, all applicants who received one of the top three scores are asked if they are interested in the position. SUCSS does not dictate the interview process; after it determines the pool of qualified candidates, the head of the department with the opening decides which candidates to interview.

In late 2015, the chief engineer for the west campus retired, and UIC posted the open job. The UIC human resources department, which maintains the civil-service register, compiled a list of the eleven candidates, including Barnes, who received one of the top-three exam scores and met the minimum qualifications. Of these eleven candidates, two were African American and nine were white, and ten had experience as assistant chief engineers at UIC.

Donavan was solely responsible for hiring the chief engineer, who would report directly to him. As a result, Donovan felt most comfortable interviewing the candidates alone. Donovan decided to interview all eleven candidates. Before each interview, Donovan reviewed the candidate's application, but he did not look at any personnel files or performance evaluations. After the interviews, Donovan selected Anthony Civito, who is white, as the new chief engineer for the west campus.

Civito and Barnes both have several decades of education and relevant experience as operating engineers. Civito worked as a senior head engineer for Professional Business Providers at Midway Airport from 2000 until 2011. UIC hired Civito as a plant operating engineer in 2011 and promoted him to an assistant chief the following year. When UIC first promoted Civito, he worked on the east campus. He later informed Donovan that he had an interest in working on the west campus because of the different challenges it posed, and Donovan moved him.

Barnes was an engineer at the Sheraton Chicago Hotel and Tower from 1992 to 2005. He began as an apprentice before he was promoted to general maintenance and then, in 1999, to operating engineer. Barnes also worked at Governors State University as a power plant engineer before moving to UIC in

2008. UIC promoted Barnes to an assistant chief engineer on the east campus in 2010.

Donovan interviewed Barnes for 15 to 30 minutes. Barnes did not bring anything with him to the interview, nor had he been asked to. Barnes recalled that during the interview Donovan asked him to "tell him about myself" as well as "what I would do" and "how I would help the university." Barnes answered that he would implement "systems that help save money for the university" and "dress codes for the engineers." Barnes shared that he would work to get the best prices from vendors and implement a new maintenance program to identify faulty pipes during the summer, rather than waiting until they froze in the winter.

Donovan interviewed Civito for about 20 minutes. Civito, unprompted, brought written materials to the interview including his civil-service application, his résumé, a letter of reference, a narrative work history, a proposal to solve problems with a UIC building, and several trainings he developed to teach engineers about working on different systems. Civito recalls that Donovan asked him questions related to operational processes during the interview and asked how Civito would handle certain scenarios, although he does not remember the specifics.

After Donovan promoted Civito, Barnes sued, alleging that Donovan failed to promote him because of his race and that the university has a practice or custom of not promoting African Americans to the chief engineer level. Barnes believed that he was more qualified for the position because of his years working at the Sheraton Hotel and the high standard for customer service that he learned there, as well as the different mechanical systems that he had worked on outside the

university. Barnes also learned during discovery that in performance reviews filled out by the same supervisor, he had received a higher score than Civito. Both Barnes and Civito received an overall rating of "Meets Expectations" in their October 2014 reviews, but Barnes scored 17/21 to Civito's 15/21. When deciding whom to hire, Donovan did not review or consider performance reviews because he "did not believe that the reviews were a good indicator of performance or readiness to advance to the next level." Instead, Donovan considered only the interviews. He attests that he selected Civito because he came to his interview fully prepared and with extensive materials and, during the interview, articulated the most thoughtful approach to taking over the chief engineer position, demonstrated a commitment to professional development by taking continuing coursework, and discussed his previous experience as a senior head engineer supervising an operation of dozens of people at Midway Airport.

The defendants moved for summary judgment, arguing that Barnes could not show that Civito was not better qualified for the position or that Donovan's reason for promoting Civito was a pretext for discrimination. The district court granted the motion for summary judgment, determining that Barnes lacked sufficient evidence to support a prima facie case of discrimination or to allow the inference that the legitimate, nondiscriminatory reason offered for hiring Civito instead of Barnes was pretextual. We review the grant of a motion for summary judgment de novo, viewing all facts and making all reasonable inferences in favor of the non-movant. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018).

The legal standard for analyzing racial discrimination claims under Title VII and § 1983 is the same.[1] *Lauderdale v. Ill. Dep't of Human Servs.*, 876 F.3d 904, 910 (7th Cir. 2017). The applicable standard at summary judgment is whether the evidence would permit a reasonable factfinder to conclude that racial discrimination caused the adverse employment action—here, the failure to promote. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Because the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) remains useful for focusing the evidence, and both parties use it, we also apply that framework. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018).

To survive summary judgment on his failure-to-promote claim, Barnes needed evidence that: (1) he is a member of a protected class, (2) he was qualified for the position sought, (3) he was rejected for the position, and (4) someone outside the protected class who was "not better qualified" was hired instead. *Riley v. Elkhart Community Schools*, 829 F.3d 886, 892 (7th Cir. 2016). If there is sufficient evidence from which a jury could find a prima facie case of discrimination, the burden shifts to the defendants to produce evidence of a legitimate, nondiscriminatory reason for hiring Civito over Barnes. *Id.* at 891. Then the burden shifts back to Barnes to produce evidence that the defendants' proffered reason was pretextual. *Id*. at 892. Because the prima facie and pretext inquiry often overlap, if a defendant offers a nondiscriminatory reason for

---

[1] Barnes also invokes 42 U.S.C. § 1981, but that statute "does not create a private right of action against state actors." *Campbell v. Forest Pres. Dist. of Cook Cty.*, 752 F.3d 665, 666 (7th Cir. 2014). Rather, § 1983 is "the exclusive remedy for violations of § 1981 committed by state actors." *Id*. at 671.

its actions, we can proceed directly to the pretext inquiry. *See Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009).

The defendants put forth a legitimate, nondiscriminatory reason for hiring Civito instead of Barnes: Donovan believed that, based on his interview, Civito was the best candidate for the chief engineer position. *See Scruggs*, 587 F.3d at 838–39 (selecting someone that employer honestly believes is better qualified for position is legitimate nondiscriminatory reason). Donovan attested that he believed Civito was the best choice because, in his interview, he articulated the most thoughtful approach to taking over the position, including his plan to revamp operating engineer shift picks to reduce labor costs and his recognition of the need for assistant chiefs to spend more time in campus buildings identifying problems. Donovan also attested that Civito addressed specific instances of teaching his subordinates, provided examples of training materials that he had created for his team, and discussed a project that he led on west campus. Barnes denies that Donovan selected Civito because he had the best interview, but he does not put forth evidence that suggests Donovan lied about this reason. He therefore cannot establish pretext, which is not "just faulty reasoning or mistaken judgment on the part of the employer; it is [a] 'lie, specifically a phony reason for some action.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) (quoting *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006)).

The best Barnes can do is point to problems with the interview process: it was unstructured, subjective, and therefore, he contends, unfair. Specifically, Barnes notes that Donovan conducted the interviews by himself, did not ask the candidates the exact same questions, and did not document why he

chose Civito for the position. But just because interviews are not cookie-cutter does not mean they are discriminatory. And, even if this unstructured and subjective method of interviewing is disfavored, Barnes merely shows that Donovan's process was not "accurate, wise, or well-considered"; that does not make his stated reason for hiring Civito a lie. *Bates v. City of Chicago*, 726 F.3d 951, 956 (7th Cir. 2013) (quoting *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000)).

As further evidence of pretext, Barnes argues that Civito was less qualified for the job, citing the October 2014 performance review on which Barnes scored two points higher than Civito. But both Barnes and Civito had an overall performance rating of "Meets Expectations" on this review, and both had only positive comments from their supervisor. This is not the substantial gap in credentials that can support an inference of pretext. *See Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 562 (7th Cir. 2004). Moreover, Donovan testified that he did not consult performance reviews in making his decision because he did not believe that they were a good indicator of performance. Whether this was wise is, again, not a question of pretext, which looks only to veracity. *See Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006). Barnes has criticized the hiring process, but has not brought forth any evidence that this process was used to hide racial discrimination. *See Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 465 (7th Cir. 2014).

Barnes also argues that failing to promote him to chief engineer was discriminatory because UIC has a history of failing to promote African Americans and because an African American has never been a chief engineer. An employer's policy and practice with respect to employing members of protected

classes "can be relevant evidence of pretext or discrimination," but that evidence "must undercut the specific justifications given by the employer." *Ford v. Marion Cty. Sheriff's Office*, 942 F.3d 839, 858 (7th Cir. 2019) (alleging "an 'ongoing history of discrimination'" is "not enough to impugn a particular employment decision"). And, although Barnes argues that Donovan perpetuated a history of discrimination by choosing to promote Civito, he did not contradict the defendants' evidence that Donovan had previously promoted African Americans to head positions on campus, and had previously encouraged African Americans to apply for chief engineer.

Further, to the extent that Barnes seeks to hold UIC liable for its "history of failing to promote African Americans to its highest positions," he has not pursued a disparate-impact theory, which would require "isolating and identifying the specific employment[] practices that are allegedly responsible for any observed statistical disparities." *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 717 (7th Cir. 2012) (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988). Nor has he shown that intentional racial discrimination was a "pattern or practice" at UIC. *See id.*

As a final note, the district court held that the Eleventh Amendment barred Barnes's § 1983 challenge against the Board. Barnes does not specifically challenge the judgment on his purported constitutional claim against the Board, but we wanted to clarify the grounds on which it fails. Although constitutional immunity extends to non-consenting arms of the state, *see Carmody v. Bd. of Tr. of Univ. of Ill.*, 893 F.3d 397, 403 (7th Cir. 2018), in a suit under § 1983 there is no need to resort to constitutional principles. "[Q]uestions of sovereign

immunity do not arise because § 1983 does not create a claim against a state for damages." *Kolton v. Frerichs*, 869 F.3d 532, 536 (7th Cir. 2017). The Board of Trustees, as part of the State, is not a "person" capable of being sued for damages under § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Haynes v. Ind. Univ.*, 902 F.3d 724, 731 (7th Cir. 2018). Although, in his complaint, Barnes requested an injunction "to abolish discrimination," he never pursued an injunction, so he does not have a claim under *Ex parte Young*, 209 U.S. 123 (1908).

For the foregoing reasons, we affirm the district court's entry of summary judgment.